O. D Cain, et al. * v. Commissioner. Cain v. Commissioner
Docket Nos. 6527-66, 6528-66, 6529-66, 6530-66 and 6531-66.
United States Tax Court
T.C. Memo 1971-45; 1971 Tax Ct. Memo LEXIS 287; 30 T.C.M. (CCH) 197; T.C.M. (RIA) 71045; March 11, 1971, Filed R. F. Duncan, for the petitioners. James D. Burroughs, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax and additions to tax for the taxable year 1956 as follows: Addition to
Docket
Tax Sec.
Petitioner
No.
Deficiency
6653(b)
O. D. Cain
6527-66
$ 23,620.05
$ 11,810.02
Cora H. Cain
6528-66
23,620.05
11,810.02
Weldon B. Archer
6529-66
32,201.47
16,100.73
F. P. Dover
6530-66
23,012.41
11,506.20
Mabra F. Dover
6531-66
23,012.41
11,506.20 198 The issues presented for decision in this case are (1) whether the petitioners received income in the form of cash payments arising out of payoffs or kickbacks, and (2) whether any part of any underpayment of tax by any of the petitioners is due to fraud. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Petitioners, O. D. Cain and Cora H. Cain, are husband and wife and were such during the taxable year 1956. At the time of filing of the petitions herein *289 they resided in Lawrenceville, Georgia. They filed their joint Federal income tax return for the taxable year 1956 with the district director of internal revenue at Atlanta, Georgia. Petitioner Weldon B. Archer is an individual with residence in Buford, Georgia. He filed his individual Federal income tax return for the taxable year 1956 with the district director of internal revenue at Atlanta, Georgia. Petitioners, F. P. Dover and Mabra F. Dover, are husband and wife and were such during the taxable year 1956. At the time of filing of the petitions herein they resided in Buford, Georgia. They filed their joint Federal income tax return for the taxable year 1956 with the district director of internal revenue at Atlanta, Georgia. During the year 1956 and for six years prior thereto, petitioners, O. D. Cain, Weldon B. Archer and F. P. Dover (hereinafter referred to as Cain, Archer, and Dover or the petitioners) were Commissioners of Roads and Revenues for Gwinnett County, Georgia. They were the only commissioners of Gwinnett County. The office of county commissioner was a full-time job. They were defeated in an election in 1956 and left office on December 31, 1956. The business of *290 the county was conducted by a majority vote of the three commissioners. No individual commissioner could do anything of a substantial nature without approval of a majority of the commissioners. They consulted each other on all county business. During the term of office of the petitioners, the voters of Gwinnett County authorized the construction of a county-wide water system. The petitioners, as county commissioners, were charged with the duty and responsibility of letting the contract and/or contracts essential for the construction of the water system. Construction of the water system was to be financed entirely by revenue bonds. Before undertaking a project of this size, the petitioners thought it necessary to obtain an economic feasibility report. Sometime in 1954, Archer contacted A. P. Welker, a partner in an engineering firm which did work in connection with water and sewer systems, for information as to how to proceed with a county-wide water system. Welker told him that the first thing he had to do was to employ an engineer and make certain that he was competent and honest. On the project such as this, the first task of the engineer is to prepare a preliminary report *291 which is an engineering study, as well as an economic feasibility study. If it is determined that the county can undertake the project from a financial standpoint, financial arrangements are made and the engineer proceeds to complete the final plans and specifications. After construction begins, the engineer supervises the project on a full-time basis. As various stages of the project are completed in accordance with his plans and specifications, he approves the work, and the county then authorizes payment to the contractor for work performed. At his meeting with Archer, Welker indicated that his firm was interested in preparing a feasibility study for the county, and in doing the engineering work. A few days later, Welker proposed a price of $7,500 for preparing a feasibility study and this was discussed on two or three other occasions with Archer. Welker and his partner then had a meeting with Cain, Archer, and Dover to discuss this further but were unable to reach any agreement. During the discussion, Cain or Dover asked Welker what would happen if the feasibility report appeared favorable and Welker explained the procedures for letting the contract by bid. Cain or Dover then *292 asked him "where they got theirs." Welker asked what was meant by this and was told that the petitioners wanted "10 percent of the project." Welker then told them that his firm was no longer interested in the project and made no further attempts to get the job. In June 1954, Ernest E. Pund, an employee of the engineering firm of Patchet & Zimmerman, was aware that Gwinnett County planned to construct a water system 199 and called on Dover to indicate that his firm was interested in handling the engineering work involved. In July 1954, Pund met with Dover to discuss this further and Dover suggested that Archer should also be present. Before Archer arrived, Dover indicated to Pund that whatever Archer did would be satisfactory with Cain and himself. On October 15, 1954, Pund had lunch with Archer and mentioned that he was a retired city engineer. Archer referred to Pund's experience with government projects and then said that he wanted to know how the petitioners "can work it out" so that they could "get something out of this job." Pund tried to evade the question but Archer pressed it. Finally, Pund told him that he did not know how it could be done without its becoming known. *293 Pund continued, unsuccessfully, to make efforts to have his firm hired to do the engineering work on the project. During 1954 and 1955 Robert P. Matson was employed by Armco Drainage Products as a sales engineer. He had known petitioners since 1950 in connection with his attempts to sell them drainage products for county roads. He had twice made sales of culverts to Gwinnett County. One of these involved a project paid for by the state. Since there was no one available who knew how to install this type of culvert system, he agreed with petitioners to supervise the installation. The petitioners provided him with prison labor and tools. Before he received payment for his work he agreed with the petitioners to split the amount received. After receiving a check for $1,400 from Gwinnett County, he cashed the check and under the predetermined agreement he kept one-fourth of the proceeds and gave one-fourth each to Cain, Archer, and Dover, giving Cain's share to Archer for delivery to him since Cain was not present when the check was cashed. Matson paid petitioners in cash since this was the form of payment specified by Archer. Over a lengthy period of time in 1954. Matson discussed the *294 Gwinnett County water system on numerous occasions with Archer and Dover and occasionally with Cain. He sought to encourage petitioners since he hoped to stimulate the sale of pipes made by Armco. After petitioners had decided that there was a definite need for such a project, Matson met with them in the county courthouse. They asked him to recommend an engineer for the project who would be cooperative in arranging "remuneration" for them from this project. This was discussed primarily by Archer. In several prior conversations with petitioners they had indicated to him that they did not receive a great deal of money for the work they performed as commissioners and that they sought additional "remuneration" because of the increased personal expenses incurred in connection with their jobs. Matson was not acquainted with such an engineer at that time. Matson attempted to locate such an engineer by contacting Howard Barry, a construction contractor in Warner Robbins, Georgia, whom he knew. Matson asked Barry if he could recommend an engineering firm that was not honest. Matson told Barry that there was a proposal for a water system in Gwinnett County and that "he had the county commissioners *295 in his hands" and needed a cooperative engineer so that he could make some money from the project. Barry recommended Robert Vinson whom he had known since early 1953. Barry had done a sewer project under Vinson's engineering and inspection supervision. He suggested Vinson as the man Matson was looking for since he had had to make kickbacks to Vinson every 30 days in order to keep Vinson's inspectors "off his neck" so that he could complete the job. Barry telephoned Vinson and told him what Matson had asked him. Matson also spoke to Vinson and arranged a meeting with him. At such meeting Matson told Vinson what the situation in Gwinnett County was and basically what the petitioners were looking for. He suggested that he contact the petitioners. Matson recommended Vinson to the petitioners. Vinson contacted the petitioners and by a unanimous decision they hired Vinson to be the engineer for the water system. In his capacity as engineer, Vinson prepared all the plans and specification for the project. Paul A. Buchanan, Jr., learned of the proposed county water system from a trade journal. He was the vice president of, and managed the affairs of, Buchanan Pipe Line Co., a closely held *296 family corporation located in Birmingham, Alabama, engaged in gas and water line construction. Sometime in 1955 Buchanan had a number of discussions with Vinson and Archer in an attempt to try to negotiate a contract for the construction of the water system. The negotiations lasted for about a month, but were broken off because no agreement could be reached. During the negotiations 200 Archer indicated to Buchanan that if the contract were negotiated the petitioners "were going to have to participate" in the project "in some way." During this period Buchanan did not seek to get the contract through competitive bidding, and when the negotiations ended he had no assurances that the contract would be awarded to him under competitive bidding. Vinson had control over the letting of the contract and did the work to obtain the bids. In order to prepare a bid for the project it was necessary for a prospective bidder to purchase a set of plans and specifications from Vinson for $500, which amount was not refundable. It was unusual both for the plans to cost so much and for the amount paid not to be refundable. The contract letting was advertised in trade publications and in the local *297 newspapers. The letting of the contract took place in the county courthouse on November 21, 1955, when the sealed bids were publicly opened. There were five bids, submitted in the names of Buchanan Pipe Line Co.; Sullivan, Long & Haggerty; Howard Barry; John R. Cook; and Christian Construction Company. The bid of Christian Construction Company was rejected since it covered only part of the contract and the contract was to be awarded as a whole, although the advertisements did not so specify. Of the remaining four bids, that of Buchanan Pipe Line Co. was the lowest. Prior to the letting of the contract, Buchanan asked Sullivan, Long & Haggerty to submit a complimentary bid on the project and they agreed to do so. In the construction industry a complimentary bid is a bid submitted by a contractor at the request of another contractor at a price higher than that of the contractor making the request and the contractor making the complimentary bid has no intention of accepting the contract. The bid of John R. Cook was also a complimentary bid. Although a bid was submitted in the name of Howard Barry, Barry did not submit a bid on the project and was not aware that someone had submitted *298 a bid in his name until sometime later. On the basis of the bids, the petitioners awarded the contract for the water system to Buchanan Pipe Line Co. On November 28, 1955, one week after the opening of the bids, Buchanan executed the contract with the petitioners, calling for a total contract price of about $4,000,000. Before revenue bonds of the type used to finance this project could be sold, it was necessary to have not only an economic feasibility report but also a firm contract showing that the project could be constructed from the available money. The contract with Buchanan Pipe Line Co. provided that a work order allowing it to proceed with construction would not be issued until after the bonds had been sold and the money placed in escrow. The petitioners sold the bonds to Herbert J. Sims & Company in New York City, and the money was placed in escrow in December 1955. Under the financing arrangements, no money could be disbursed to Buchanan Pipe Line Co. by the bank as escrow agent without the approval of Vinson and the petitioners of the estimates of work completed submitted each month by Buchanan Pipe Line Co. In January 1956, Buchanan had a number of discussions with *299 Archer concerning payoffs that he would have to make to the petitioners. At that time Buchanan Pipe Line Co. had not started work on the job since it had not yet received a work order. Archer told him that the money had to be split up, and initially proposed that Buchanan pay petitioners 6 percent of the total contract price of about $4,000,000. After some negotiating, they agreed that Buchanan should pay the petitioners 4 percent of the contract price. Archer suggested that the money be paid in cash and that payment should be made periodically based upon amounts paid to Buchanan Pipe Line Co. as work was completed. Buchanan was to pay petitioners within a day or so after receiving the payment for work completed. Prior to the letting of the contract, Buchanan had had discussions with Vinson concerning Vinson's proposal to set up a supply company and have Buchanan Pipe Line Co. purchase all the materials for the water system from it. Under such proposal Buchanan Pipe Line Co. would have made its purchases at a price higher than normal and the difference would then be paid to Archer so that it would not be necessary for Buchanan to pay Archer directly. Upon Vinson's instructions, Warren *300 C. Turner rented an office and opened a bank account in the name of G. & H. Supply Co. in September 1955, with his signature the only one authorized for the account. On October 20, 1955, G. & H. Supply Co. was incorporated pursuant to the laws of the State of Georgia and Turner was listed as one of the incorporators. In October 1955, 201 Vinson introduced Turner to Buchanan as his cousin. However, this plan was abandoned following the effective removal of Vinson as engineer for the project as a result of litigation by a group of citizens, including Thomas J. Hughes. Thomas J. Hughes operated the Norcross Supply Company and had known Vinson when Hughes was a salesman of transite pipe. At some time in 1955, Vinson approached him and told him that the water system project was one of the best things that he had ever been involved in and that it would be "real nice and juicy" for himself and everyone else involved. He stated that he would specify only transite pipe for the project and that the purchases could be made through the Norcross Supply Company as an agent, producing a profit of 10 percent on the sale of about $1,000,000 of pipe. Vinson informed Hughes that he would require *301 a share of such profit. Thereafter Hughes and his partner had a meeting with petitioners in their office and told them that their engineer was dishonest and that he should be removed. Archer defended Vinson and his reputation. Hughes than told them about Vinson's proposal. However, petitioners took no action on Hughes' accusations. Hughes and a number of other residents of the county formed a citizens committee and hired an attorney to look into the matter. Alleging that the letting of the contract had been illegally advertised, the committee sought to enjoin the construction of the water system unless Vinson was removed as the project's engineer. There were a number of discussions between the committee's attorney and the attorney for the commissioners. In January 1956, the petitioners met with the attorneys and a compromise was reached. Vinson was relieved of any responsibility for supervision and inspection of the construction. The citizens committee submitted a list of four engineers to succeed Vinson and the petitioners chose Jose Garcia. After this, Garcia had complete charge of the engineering duties on the project. Vinson continued to be employed as a figurehead since *302 the county's financial agents advised the petitioners that it would be embarrassing to the sellers of the bonds to have to change the name of the engineer on the financial agreements after the bonds had already been offered for sale. Vinson's only function was to put his signature on the estimates of work completed submitted by Buchanan Pipe Line Co. after they had been approved and signed by Garcia. Under the terms of the compromise, before Buchanan Pipe Line Co. could commence the construction of the water system, Garcia had to examine the contract as to the quality of the materials specified, the costs of the various units of the project, and the total estimated cost of the contract. A week later, Garcia submitted a memorandum approving the specifications and costs. After the plan to purchase materials from G. & H. Supply Co. was abandoned, a new plan was agreed upon by Buchanan and Turner whereby cash would be provided with which Buchanan could pay petitioners. Pursuant to such plan Buchanan caused checks to be drawn payable to certain named payees, delivered them to Turner, and Turner converted the checks to cash and returned the cash to Buchanan, less an amount equal to 7 *303 percent of the amounts of the checks as payment for Turner's services in this respect. The following checks of Buchanan Pipe Line Co., signed by Buchanan, were either mailed or delivered by Buchanan to Turner: Date of
Check
Check
Number
Amount
Payee
5/29/56
6267
$ 10,750.00
D. G. Chestnut, chamblee, Georgia
6/18/56
6388
$ 11,000.00
D. G. Chestnut, hauling and Sand Contractor, Chamblee, Georgia
7/ 9/56
6441
$ 11,016.14
Mr. F. G. Dunn, Duluth, Georgia
7/24/56
6560
$ 11,000.00
D. G. Chestnut, contracting Company, Chamblee, Georgia
8/ 8/56
6606
$ 11,132.56
F. G. Dunn, Duluth, Georgia
8/16/56
6700
$ 8,661.00
W. G. Green, Hauling Contractor, Sandy Springs,
Georgia
8/16/56
6701
$ 2,340.00
Charles Smith, Tractor and Bull Dozer Contractor, Decatur, Georgia
8/28/56
6736
$ 2,652.00
W. G. Green
8/28/56
6737
$ 8,346.29
F. G. Dunn, Duluth, Georgia
9/26/56
6886
$ 7,839.00
W. G. Green
9/26/56
6887
$ 3,154.00
Charles Smith
10/10/56
6923
$ 10,998.29
F. G. Dunn, Duluth, Georgia
10/25/56
7035
$ 11,029.46
Mr. F. G. Dunn, Duluth, Georgia
10/30/56
7054
$ 4,791.00
W. G. Green
10/30/56
7055
$ 6,200.00
Charles Smith
11/10/56
7156
$ 11,008.75
Owens Plumbing & Heating Co., 3114 Roswell Road, Atlanta, Georgia
12/11/56
7308
$ 13,096.42
Owens Plumbing & Heating Co., 3114 Roswell Road, Atlanta, Georgia
12/27/56
7353
$ 3,900.00
Owens Plumbing & Heating Co., 3114 Roswell Road, Atlanta, Georgia
*304 202 Buchanan also requested one of the subcontractors on the project, Christian Construction Company, to supply Turner with the following checks: Date of
Check
Check
Number
Amount
Payee
6/27/56
6939
$ 11,000.00
Charles Smith, Decatur, Georgia
11/27/56
7685
6,780.00
F. G. Dunn
11/27/56
7686
4,220.00
P. E. Boozer These checks were delivered to Turner at Vinson's office. Buchanan later reimbursed Christian Construction Company for each of the checks it had drawn. The checks of Buchanan Pipe Line Co. and Christian Construction Company amounted to about 4 percent of the payments that Buchanan Pipe Line Co. periodically received for the work completed. The names of the payees appearing on the checks were at least in some instances existing persons or firms. As to others, it is uncertain as to whether the named payees represented existing persons or firms. Buchanan was interested in charging the amounts of these checks as costs of the job, and the particular named payees on the checks were used to give the impression that the checks were in payment for plumbing, hauling, or other work on the project. Buchanan knew none of the named payees. *305 Turner had furnished him a list of possible payees but had not instructed him as to which to use. None of the named payees ever performed any work for Buchanan Pipe Line Co. or for the county water system, and none of them ever received the checks or any payment. The amounts of all such checks were charged, on the books and records of Buchanan Pipe Line Co., as expenses of the job, and were claimed as deductions. Turner used the bank account of the G. & H. Supply Co. to obtain the cash for Buchanan. The checks bore purported endorsements of the named payees. Turner endorsed the checks as auditor for G. & H. Supply Co. and deposited them in the account. A day or two later he would draw checks on the G. & H. Supply Co. account and withdraw cash in the amounts of the checks received from Buchanan, less the 7 percent he was to keep. The following summary shows the checks written by Buchanan Pipe Line Co. and Christian Construction Company and the amounts and dates of deposits and withdrawals from the G. & H. Supply Co. account: BUCHANAN PIPE LINE Co. G. & H. SUPPLY COMPANY BANK ACCOUNT
Date of
Amount
Date of
Amount
Payee
of Check
of Check
Deposit
Deposited
D. G. Chestnut
5/29/56
$ 10,750.00
5/30/56
$ 10,750.00
D. G. Chestnut
6/18/56
11,000.00
6/19/566
11,000.00
F. G. Dunn
7/ 9/56
11,016.14
7/10/56
11,016.14
D. G. Chestnut
7/24/56
11,000.00
7/25/56
11,000.00
F. G. Dunn
8/ 8/56
11,132.56
8/ 9/56
111,132.56
W. G. Green
8/16/56
8,661.00
Charles Smith
8/16/56
2,340.00
8/17/56
11,001.00
W. G. Green
8/28/56
2,652.00)
F. G. Dunn
8/28/56
8,346.29)
8/29/56
10,998.29
W. G. Green
9/26/56
7,839.00)
Charles Smith
9/26/56
3,154.00)
10/ 3/56
10,993.00
F. G. Dunn
10/10/56
10,998.29
10/11/56
10,998.29
F. G. Dunn
10/25/56
11,029.46
10/26/56
11,029.46
W. G. Green
10/30/56
$ 4,791.00)
Charles Smith
10/30/56
6,200.00)
10/31/56
$ 10,991.00
Owens Plumbing & Heating
11/10/56
11,008.75
11/14/56
11,008.75
Owens Plumbing & Heating
12/11/56
13,096.42
12/13/56
13,096.42
Owens Plumbing & Heating
12/27/56
3,900.00
12/28/56
3,900.00
CHRISTIAN CONSTRUCTION COMPANY CHECKS
Charles Smith
6/27/56
11,000.00
6/28/56
11,000.00
F. G. Dunn
11/27/56
6,780.00)
P. E. Boozer
11/27/56 4,220.00)
11/29/56 11,000.00
$ 170,914.91
$ 170,914.91
*306 BUCHANAN PIPE LINE Co. G. & H. SUPPLY COMPANY BANK ACCOUNT
Date of
Amount of
Percent
Date of
Amount
With-
With-
With-
Payee
of Check
of Check
drawal
drawal
drawal
D. G. Chestnut
5/29/56
$ 10,750.00
5/31/56
$ 10,050.00
93.5%
D. G. Chestnut
6/18/56
11,000.00
6/21/56
10,230.00
93. %
F. G. Dunn
7/ 9/56
11,016.14
7/12/56
10,245.02
93. %
D. G. Chestnut
7/24/56
11,000.00
7/25/56
10,230.00
93. %
F. G. Dunn
8/ 8/56
11,132.56
8/ 9 56
10,3/.30
93. %
W. G. Green
8/16/56
8,661.00
Charles Smith
8/16/56
2,340.00
8/17/56
10,231.00
93. %
W. G. Green
8/28/56
2,652.00)
F. G. Dunn
8/28/56
8,346.29)
8/29/56
10,228.41
93. %
W. G. Green
9/26/56
7,839.00)
Charles Smith
9/26/56
3,154.00)
10/ 3/56
10,316.50
93.9%
F. G. Dunn
10/10/56
10,998.29
10/11/56
10,205.00
92.8%
F. G. Dunn
10/25/56
11,029.46
10/26/56
10,257.40
93. %
W. G. Green
10/30/56
$ 4,791.00)
Charles Smith
10/30/56
6,200.00)
10/31/56
$ 10,221.63
93. %
Owens Plumbing & Heating
11/10/56
11,008.75
11/14/56
10,238.15
93. %
Owens Plumbing & Heating
12/11/56
13,096.42
12/13/56
12,179.67
93. %
Owens Plumbing & Heating
12/27/56
3,900.00
12/28/56
3,627.00
93. %
CHRISTIAN CONSTRUCTION COMPANY CHECKS
Charles Smith
6/27/56
11,000.00
6/28/56
10,230.00
93. %
F. G. Dunn
11/27/56
6,780.00)
P. E. Boozer
11/27/56 4,220.00)
11/29/56 10,230.00 93. %
$ 170,914.91
$ 159,073.08
*307 After withdrawing the cash, Turner delivered it to Buchanan in person either at the airport or a hotel in Atlanta. Such deliveries were generally within a couple of days after Turner had received the checks. Delivery was made in bags, generally a brown paper bag. On two or three occasions Buchanan checked the bag to see that the cash was in it, but on the other occasions he did not since he had confidence in Turner, whom he knew to be a cousin of Vinson and whom he considered to be the agent of the petitioners. After receiving the bags containing the cash from Turner, Buchanan customarily went to Gwinnett County, where he had an office in Lawrenceville, and delivered the bags to petitioners just as he had received them, without removing any of the currency. He made delivery on most occasions to Cain, on a few occasions to Archer, and on one occasion to Dover. One of the deliveries to Archer was made at the Atlanta airport just after Buchanan had received delivery from Turner. The petitioners received the bags and never complained to Buchanan about their contents, except on one occasion when Cain told him that the amount inside was $100 less than what was supposed to be there. Buchanan *308 had no knowledge of any such shortage since he had delivered the bag as he had received it from Turner without checking its contents. Buchanan Pipe Line Co. had not finished construction of the water system by December 31, 1956, when petitioners left office. It was completed during 1957 under the new county commissioners who had been elected to replace the petitioners. Buchanan Pipe Line Co. was not paid the full amount for the construction for which it had contracted. The county held back a retainage of between $80,000 and $90,000 until the project was completed and Buchanan Pipe Line Co. never received this retainage. During 1956, each petitioner received a salary of $300 per month for the services performed as county commissioner. During their first four years in office the salary was $150 per month. Prior to becoming a county commissioner, Cain was a school teacher in Gwinnett County, his salary being about $300 per month. He had been a teacher for about 32 years. His wife was also a school teacher receiving approximately the same salary. She had been a teacher for about 40 years. In 1957 Cain deposited $9,802.20 in the Gwinnett County Savings & Loan Association. In 1958, *309 he deposited approximately $9,000 in the First Federal Savings & Loan Association of Gainesville, Georgia. In 1959 he deposited $2,200 in a savings account at the Brand Bank. Prior to serving as a county commissioner, Archer had been in the lumber and sawmill business. During the ten years prior to 1957, he had "never made a great deal of money." On his Federal income tax return for the taxable year 1955, he reported income of $4,315. On June 24, 1957, he purchased 10 shares of stock in Forest Park Plaza, Inc., from W. A. Withereton for $3,252 and 18 1/2 shares from E. L. Shirah for $7,000. On July 27, 1957, he also purchased 25 1/2 shares of such stock from W. W. Edwards for $10,000. During 1957 he also paid W. W. Edwards about $8,000 for some construction work. On August 19, 1957, he purchased some real estate from R. W. Kingston for $13,500. A substantial portion of these payments, or some of them, was made in currency. 204 In their joint Federal income tax return for the taxable year 1956, Cain and his wife reported adjusted gross income of $5,983.28, consisting of salary received by him of $3,600 and salary received by her of $2,383.28. In his individual Federal income *310 tax return for the taxable year 1956, Archer reported adjusted gross income of $8,256.66, consisting of salary received by him of $3,600, profit from the operation of a fire insurance agency of $3,893.66, and dividends of $763. In their joint Federal income tax return for the taxable year 1956, Dover and his wife reported adjusted gross income of $4,972.97, consisting of salary received by him of $3,600 and salary received by her of $100, profit from the operation of a farm machinery business of $2,229.86, a loss from farming operations of $1,045.59, and miscellaneous income of $88.70. None of the petitioners reported the receipt of any amounts from Buchanan. Weldon B. Archer, F. Paul Dover, and O. D. Cain were indicted on June 25, 1962, in Atlanta, Georgia, for willfully and knowingly attempting to evade and defeat a large part of the income tax owed by them for the calendar year 1956 by filing and causing to be filed false and fraudulent income tax returns in violation of Title 26, U.S.C., Section 7201 of the Internal Revenue Code of 1954. All defendants pleaded "Not Guilty" and the trial of Weldon B. Archer commenced on July 15, 1963, in Atlanta, and ended *311 on the afternoon of July 16, 1963. Buchanan was a witness at such trial. The jury reached a verdict of "Not Guilty." The charges against O. D. Cain and F. P. Dover were dismissed at the request of the United States Attorney because the evidence to be presented in those cases was the same as that presented in the case against Weldon B. Archer. In the notice of deficiency mailed to each petitioner the respondent made the following determination: It is determined that you received cash payments of $53,024.36 arising out of pay-offs by Buchanan Pipeline Co. and/or Paul Buchanan, and that such payments constitute gross income to you. Since you did not report this income, your taxable income is increased $53,024.36. The respondent also determined that some part of the underpayment of tax by each petitioner was due to fraud and therefore asserted the 50 percent addition to tax pursuant to section 6653(b) of the Internal Revenue Code of 1954. During the taxable year 1956, Cain, Archer, and Dover each received from Buchanan the amount of $53,024.36 as kickbacks or payoffs. Some part of the underpayment of tax for the taxable year 1956 by Cain, Archer, and Dover *312 is due to fraud. Opinion The questions presented are whether in the taxable year 1956 each of the petitioners received income of $53,024.36 in the form of kickbacks from Paul A. Buchanan and/or Buchanan Pipe Line Co., as determined by the respondent, and, if so, whether any part of any underpayment of tax was due to fraud. Each petitioner took the stand and categorically denied having received such kickbacks. The respondent offered the testimony of Buchanan and other witnesses as well as certain documentary evidence. We have given careful consideration to all the evidence and have concluded and have found as a fact that each of the petitioners did receive kickbacks from Buchanan in the amounts determined by the respondent. In reaching our conclusion, we have placed primary reliance upon the testimony of the respondent's witnesses. We have set forth hereinabove in detail the facts upon which we have based our conclusion. Petitioners attack the credibility of Buchanan and certain other witnesses of the respondent and upon this basis urge us to disregard their testimony. On brief the petitioners, after reviewing the testimony of witnesses Pund, Welker, Barry, and Matson, state *313 that these witnesses were either persons who were disgruntled because they were not given any business by the petitioners and/or persons who admitted participating in or condoning the practice of making payoffs. Pund and Welker were engineers who had been interested in doing the engineering work on the water system. They testified as to inquiries by the petitioners as to the possibilities of arranging kickbacks on the project. There is no indication in the record that either one of them was aggrieved over not receiving any engineering work. Petitioners have pointed to no other facts which would reflect on their credibility, and we accept their testimony at face value. Matson testified that he agreed to find a "cooperative" engineer for petitioners, and 205 that he contacted Barry, who recommended Vinson as such an engineer. Barry testified that he recommended Vinson to Matson because at some prior time he had been forced to make kickbacks to Vinson. Matson also testified to having made kickbacks to the petitioners on a prior small project. Thus, both Matson and Barry admitted to participating in kickbacks. In considering the testimony of these two witnesses we have taken *314 these facts into account, as well as the fact that Matson had failed in an attempt to profit from the project by arranging for sales of pipe for the project. However, we have concluded that these facts do not detract from their credibility with respect to their testimony herein. Buchanan testified in detail as to his agreement to pay the petitioners kickbacks amounting to 4 percent of the contract price of the water system and as to his payment of such kickbacks, as set forth in our Findings of Fact. The petitioners' principal attack is against Buchanan. They contend that it is just as reasonable to conclude that Buchanan himself kept the money that he claims he gave to the petitioners. We cannot agree. There is nothing in the record which suggests that Buchanan kept the money. The petitioners have advanced several arguments directed to Buchanan's credibility. We have carefully considered all such arguments, but are of the opinion that his credibility has not been impaired. His testimony was forthright and believable and we have accepted it as true in all material respects. He freely admitted that he was responsible for drawing the checks which provided the cash involved herein *315 in such a manner as to appear as cost of the job, and thus provide a fictitious deduction claimed by the Buchanan Pipe Line Co., and that the checks were questioned by the Internal Revenue Service in an audit of the company's return. He further testified, however, that he was not given any promises in consideration for the information which he furnished with regard to the kickbacks. The petitioner Dover and his son testified to the effect that in the spring of 1962 they had a meeting with Buchanan at which he admitted to them that he had not made any payment to Dover. However, Buchanan testified to the effect that he did not recall such a meeting and that he did not make any such concession. It may be further pointed out that Buchanan's testimony as to what transpired is reasonable in the light of the attempts by the petitioners, testified to by disinterested witnesses, to arrange for kickbacks from this project. We accordingly do not accept as true the testimony of the petitioners that they did not receive the kickbacks. We have found as a fact that they did, in connection with a prior project, accept kickbacks and, as pointed out above, they had attempted to arrange for kickbacks *316 with others in connection with the project in question. Furthermore, two of the petitioners in the years 1957 and 1958 made bank deposits, or made purchases, involving substantial amounts of cash, the sources of which were not satisfactorily explained. In view of the foregoing, we approve the respondent's determination that during the taxable year 1956 Cain, Archer, and Dover each received from Buchanan the amount of $53,024.36 as kickbacks. It is clear that the kickbacks so received by the petitioners constitute taxable income. Caldwell v. Commissioner, (C. A. 5) 135 F. 2d 488. There remains the issue as to whether petitioners are liable for additions to tax for fraud under section 6653 of the Internal Revenue Code of 1954. [1] The issue of fraud is one of fact to be determined upon a consideration of the entire record. William G. Stratton, 54 T.C. 255, and cases cited therein. Under section 7454(a) of the Internal Revenue Code of 1954[2], the 206 burden of proof with respect to fraud is upon the respondent. Fraud is never presumed. It must be affirmatively established by clear and convincing evidence. *317 Carter v. Campbell, (C.A. 5) 264 F. 2d 930; and William G. Stratton, supra.
*318 Our finding that the petitioners received the kickbacks is established by clear and convincing evidence, and, as stated, there is no question that such kickbacks constitute taxable income to them. None of the petitioners reported this income in his income tax return. This fact and the fact that petitioners required the kickbacks to be made in cash indicate to us that petitioners intended to conceal such income and thereby evade the tax thereon. We have accordingly concluded and have found as a fact that some part of the underpayment of tax for the taxable year 1956 by Cain, by Dover, and by Archer is due to fraud. On brief it is contended that Archer's acquittal of the criminal charge should be determinative of the issues here presented. However, it is well settled that an acquittal in a criminal proceeding does not bar a finding of fraud in a civil proceeding. Helvering v. Mitchell, 303 U.S. 391. See also, Elmer J. Benes, 42 T.C. 358, aff'd. (C.A. 6) 355 F. 2d 929, certiorari denied 384 U.S. 961, and cases cited therein. In view of the foregoing, we approve the respondent's determinations that petitioners Cain, Dover, and *319 Archer are liable for deficiencies in tax and additions to tax under section 6653(b) of the Code in the amounts determined. Public Law 91-679, 84 Stat. 2063, which was enacted on January 12, 1971, and which is applicable to all years to which the Internal Revenue Code of 1954 applies, amended section 6653(b) of the Code by adding the final sentence thereof, (see footnote 1, supra) and amended section 6013 of the Code, which provides for joint and several liability of each spouse when a joint return is filed, by adding at the end thereof the following new subsection which provides in part as follows: (e) Spouse Relieved of Liability in Certain Cases. - (1) In General. - Under regulations prescribed by the Secretary or his delegate, if - (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account *320 whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. We have carefully considered all of the evidence of record and have concluded that petitioners, Mabra F. Dover and Cora H. Cain, are entitled to the relief provided by section 6013(e). Each of them filed a joint return with her spouse, and it is clear from the facts that we have found that in each instance the amount omitted from gross income was in excess of 25 percent of the gross income reported. Mabra F. Dover testified that so far as she knew neither she nor her husband had any income which was not reported in the joint return for the taxable year 1956 and, in effect, that she had no reason to know of the omission which we have found that her husband made. *321 Cora H. Cain testified that the joint return for the taxable year 1956 reflected the true income of herself and her husband to the best of her knowledge and, in effect, that she had no reason to know of the omission which we have found that her husband made. We have carefully examined the testimony of both these petitioners and conclude that they have established that in signing the returns they neither knew of, nor had reason to know of, the omissions from gross income. It is also our opinion that their testimony, in effect, is sufficient to establish that they did not significantly benefit from the items which we have found their husbands omitted from gross income. In view of this and all the other facts and 207 circumstances, we think it would be inequitable to hold either Mabra F. Dover or Cora H. Cain liable for the tax attributable to their respective husbands' omissions from gross income. Accordingly, we hold that pursuant to the terms of section 6013(e) petitioners, Mabra F. Dover and Cora H. Cain, are each relieved of liability for the deficiencies in tax determined by respondent and for any additions to tax under section 6653(b). Decisions will be entered for the *322 respondent in Docket Nos. 6527-66, 6529-66, and 6530-66. Decisions will be entered for the petitioners in Docket Nos. 6528-66 and 6531-66. Footnotes
*. Proceedings of the following petitioners are consolidated herewith: Cora H. Cain, Docket No. 6528-66; Weldon B. Archer, Docket No. 6529-66; F. P. Dover, Docket No. 6530-66; and Mabra F. Dover, Docket No. 6531-66.↩
1. Section 6653 of the Code provides in part as follows: (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. (c) Definition of Underpayment. - For purposes of this section, the term "underpayment" means - (1) Income, estate, gift, and chapter 42 taxes. - In the case of a tax to which section 6211 (relating to income, estate, gift, and chapter 42 taxes) is applicable, a deficiency as defined in that section (except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A) shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing), * * * ↩
2. Section 7454(a) of the Code provides as follows: Fraud. - In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate.↩