**CALDWELL et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 10519.

Circuit Court of Appeals, Fifth Circuit.

May 13, 1943.

Roland C. Kizer, of Baton Rouge, La., for petitioners.

Benj. B. Taylor, of Baton Rouge, La., amicus curiae, for petitioner.

Joseph M. Jones, Sewall Key, and J. Louis Monarch, Sp. Assts. to the Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Chief Counsel, and John T. Rogers, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before SIBLEY, McCORD, and WALLER, Circuit Judges.

SIBLEY, Circuit Judge.

The petitioners are husband and wife domiciled in Louisiana who made separate returns for income taxation for the years 1935 to 1938 inclusive. The income was all earned by the husband and fell into the marital community. The wife's returns are counterparts of the husband's; and the issues were consolidated before the Board of Tax Appeals, and a joint petition for review is brought here. A fraud penalty was assessed against Caldwell but not against his wife. Identical deficiencies for each year were assessed against both. These arise out of, First, compensation in addition to fixed salary paid by Louisiana State University from funds appropriated by the State of Louisiana to Caldwell as Superintendent of Building at the University, which petitioners claim is not assessable under the Public Salary Tax Act of 1939, 53 Stat. 574, 26 U.S.C.A.Int.Rev.Code note to section 22; Second, "kickbacks", or payments to Caldwell made by various contractors to obtain contracts for the erection of buildings for the University, or other favors.

First: During the tax years Caldwell was employed as Superintendent of Building at Louisiana State University at a fixed salary ranging from $4,500 in 1935 to $6,000 in 1936. No effort is made to assess this salary. A very large building program was undertaken in 1935 greatly increasing Caldwell's work and responsibility. In 1936 an arrangement was made with President Smith of the University to pay in addition one percent on the cost of the buildings whose erection Caldwell superintended, and this was paid until in February, 1938. Caldwell, having then to use 700 to 800 W.P.A. workers who, not being skilled artisians, required extra attention, received from President Smith a raise of the bonus to two percent. These percentages were paid out of funds appropriated by the State Legislature for the support of the University, an instrumentality of the State, on vouchers regularly drawn by President Smith, approved by the University's Business Manager, and audited by its Auditor. Now the Act of 1939, §§ 201 and 202, prohibits taxation as income for years prior to 1939 of "compensation for personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality" thereof unless pursuant to an assessment made prior to Jan. 1, 1939, and abates assessments later made. The assessment here was made February 10, 1940. The question is therefore whether these percentages in addition to the fixed salary are compensation for personal service as an employee of a State agency or instrumentality. The University is a State agency. Caldwell was employed for his full time by it to superintend construction of its buildings. His service was personal. The percentages as well as the salary were paid for superintendence in the line of his duty. The Board of Tax Appeals thought, however, that the payment of the percentages was not authorized by the Board of Supervisors, the governing body of the University, but was a fraudulent arrangement with President Smith, a practical embezzlement of the State's money, not entitled to the statutory protection. If the payments were embezzlements the State would be entitled to recover them, and the record indicates that a suit has been brought for such recovery. The Supervisors of the University file a brief as amicus curiae, asserting that Caldwell's property has been attached by the State, and is insufficient to repay the State and these tax claims, making a situation like that in McKnight v. Commissioner, 5 Cir., 127 F.2d 572, in which we held that no taxable income was gained by an embezzlement. We need not consider the application here of the principle there decided, because we do not think the evidence in this record shows a case of such embezzlement. Smith is in the penitentiary for other frauds, and did not testify. He got none of this money. Caldwell is in the penitentiary for evasion of income taxes under the tax returns now before us on a plea of guilty, and did not testify. The Business Manager of the University, whose integrity is not questioned, testifies: "I remember the occasion on which Mr. Caldwell's salary was raised from one to two percent. They had thrown all this W.P.A. help on him and he was going to quit. I went to Dr. Smith at that time myself. I think he told me to send George (Caldwell) over, or either to go ahead and allow him two percent. I don't know whether I made the arrangement with George, but I think he went to Dr. Smith's office after I talked with Dr. Smith. * * * Mr. Caldwell quit and did not come out for a couple of days. I think he was figuring on bidding on some job for himself. * * * As Business Manager I okehed and approved all of the bills before they went to the Auditor's office for payment."

This is the only direct testimony of what occurred between Smith and Caldwell. The payment of one percent previously was known generally. Two of the Supervisors who testified said they knew of it, though they did not recall authorizing it. There was no secret about any of these payments. Two architects testified that Caldwell did render valuable supervisory service, for which the minimum compensation to an architect would have been four percent, and what was paid Caldwell, including his salary, was no more than a fair compensation. The architects were jealous at the time of Caldwell's employment to supervise the construction.

As to Dr. Smith's authority to raise Caldwell's pay, the Supervisors who testify all say that salary matters were generally left to Smith and they approved his suggestions and actions. The keeper of their minutes testified: "Throughout the minutes of this book, and others, there are resolutions of the Board granting Dr. Smith authority to make such salary adjustments as he sees fit. That was done at least once throughout every year of his tenure of office. And just two or three months prior to the two percent increase given Caldwell in 1938, there was a resolution that the Board passed granting him authority to make adjustments." That resolution, passed Sept. 25, 1937, reads that Dr. Smith stated that unusual services were being rendered by some of the staff and salaries were in some instances not properly adjusted, whereupon it was unanimously resolved "That the President of the University be and he is hereby authorized to make such salary adjustments for the current session as in his judgment are right and equitable." These annual resolutions, admittedly genuine, seem to afford sufficient authority to Smith. There are, however, two which refer specially to Caldwell. One in the minutes of Dec. 7, 1936, stated to have been offered by Judge Doré and seconded by Peltier, and unanimously adopted, authorizes one percent on the cost of buildings to be paid to Caldwell in addition to his salary. Doré testifies he was not at that meeting and Peltier that he does not remember the resolution. Another resolution in the minutes of Feb. 19, 1938, stated to have been offered by Doré and seconded by Peltier, and unanimously adopted, authorizes two percent in addition to salary to be paid Caldwell, his use of W. P. A. labor

and the saving of architect's fees being mentioned. This resolution also Doré and Peltier do not remember. A third Supervisor, Pratt, testified that he was positive the two percent resolution was not passed in February, 1938, but did not remember whether he was present December 7, 1936. The minutes of that date show him absent. He admitted knowing that one percent was being paid Caldwell. There appear to have been fourteen Supervisors. The others did not testify. It is shown that all meetings were stenographically reported, but the reports were not brought forward. These minutes were not signed by Smith, the Secretary of the Supervisors; but the others were unsigned also. The book as a whole is recognized and followed as the book of Minutes of the Supervisors; and the affairs of the University are conducted according to its contents. We are of opinion that what appears in it is presumptively the action of the Supervisors, and the burden is on one claiming otherwise to show clearly mistake or fraud in them. A mistake as to who offered a resolution would not be important. That the Secretary proved a rascal and a criminal, and forged some minutes affecting his own transactions, would not justify a conclusion that other minutes not affecting him were forgeries. Much less would Caldwell's admission by plea of guilty that he had evaded payment of income taxes afford ground to find that minutes affecting him were false. Granting that there was a bad atmosphere about the University in the tax years which justifies suspicion, that is not proof which may prevail. The evidence does not justify the conclusion that what was regularly and openly paid Caldwell for his services was wholly unauthorized and was a steal. What he received was income, but is not subject to assessment under the Act of 1939.

Second: The "kickbacks" paid by contractors to Caldwell are proved in detail. The tax returns each show large amounts as "Other Income, Gambling", or "Games of Chance", which are now claimed to represent these "kickbacks". There was no evidence as to whether there were any winnings at games of chance, or that these items were intended to represent the "kickbacks". The Commissioner, on tracing deposits in banks, concluded as to three years that the "kickbacks" were in the gambling items. In the year 1937 he did not so find. The Board thought there

was no evidence to require a finding otherwise for that year. The Commissioner proved that certain payments were received from contractors. The return admits an income from gambling. No one testifies that the two are in whole or in part the same. Both incomes are taxable.

■ These "kickbacks" do not at all appear to be plain embezzlements of the State's funds, but were paid by the contractors as their money, and received by Caldwell as his own. It may be that they were in some cases a fraud on the State for which it may recover, and that Caldwell may become entitled in the year of such payment to a deduction; but until then they are his income. The situation is controlled by North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197, rather than by McKnight v. Commissioner, 5 Cir., 127 F.2d 572.

■ In view of all the evidence, including Caldwell's plea of guilty to the charge of tax evasion under these returns, considered as an admission of fact, the assessment of a fraud penalty against him was warranted. The amount of it of course can be adjusted according to the redetermined tax.

The judgment is modified by eliminating as taxable income the sums paid by the University to Caldwell for personal services, and the cause is remanded for a recomputation of the tax accordingly.