## AKERS et ux v. SCOFIELD.
### Civil Action No. 190.

District Court, W. D. Texas, Austin Division.
Sept. 20, 1947.

Schlesinger & Goodstein, of San Antonio, Tex., and Robert Ash, of Washington, D. C., for plaintiffs.

J. M. Burnett, U. S. Atty., of San Antonio, Tex., for defendant.

RICE, District Judge.

This is a suit for refund of income taxes paid by plaintiffs.

The sole question here presented is whether money received by a self-confessed swindler from his victim, an eighty-two year old widow, is income to him and taxable as such.

The facts were stipulated and are found to be as follows:

I. Plaintiffs, James A. Akers and Lela Akers, his wife, reside in Bexar County, Texas.

II. Defendant, Frank Scofield, is the Collector of Internal Revenue for the First District of Texas, with his office in Austin, Texas, and has at all times germane to this action acted in his official capacity as such Collector, and is the Collector to whom the tax for which this suit is brought was paid.

III. On January 22, 1940, an indictment was returned by the Grand Jury of the Austin Division of this District charging in the First Count thereof that on or about March 15, 1934, James A. Akers unlawfully and wilfully attempted to evade income tax in the amount of $1,354.90 on account of net taxable income in the amount of $18,135 received by him during the calendar year 1933. The Fourth Count of said indictment charged that on or about March 15, 1937, the defendant unlawfully and wilfully attempted to evade income tax in the amount of $572.05 on account of the net taxable income in the amount of $18,615.54 received by him during the calendar year

1936. The Second and Third Counts of said indictment charged similar violations for evading income taxes based upon net taxable income received by him during the calendar years 1934 and 1935, respectively. On January 31, 1940, the defendant entered his plea of guilty to the First and Fourth Counts of said indictment, whereupon the Second and Third Counts were dismissed.

On January 31, 1940, the court sentenced the defendant as follows: On the First Count: $10,000 fine, for the payment of which the defendant stood committed, and

1932, 1933 and 1936 in the following amounts:

| | |
|---|---|
| 1932 | $ 540.66 |
| 1933 | 571.67 |
| 1936 | 1400.53 |
| Total | $2512.86 |

The following schedule sets out the date the Commissioner of Internal Revenue assessed income taxes, the amounts of same, the date and amounts paid on the taxes so assessed:

| Taxpayer | Date Assessed | Taxable Period | | Amount Assessed | Amount Paid | Date Paid |
|---|---|---|---|---|---|---|
| J. A. Akers and wife | 1–24–41 | 1932 | | $1378.68 | $540.66 | 2–5–41 |
| | | | P | 344.68 | | |
| | | | P | 344.67 | | |
| | | | I | 645.84 | | |
| J. A. Akers and wife | 1–24–41 | 1933 | | 745.32 | 171.67 | 10–24–41 |
| | | | P | 186.34 | 200.00 | 12–8–41 |
| | | | P | 186.33 | 200.00 | 1–12–42 |
| | | | I | 304.43 | | |
| J. A. Akers | 1–24–41 | 1936 | | 473.65 | 13.38 | 5–9–41 |
| | | | P | 236.83 | 200.00 | 6–9–41 |
| | | | I | 108.20 | 200.00 | 7–8–41 |
| | | | | | 200.00 | 8–7–41 |
| | | | | | 200.00 | 9–12–41 |
| | | | | | 5.30 | 10–24–41 |
| | | | I | 23.03 | 23.03 | 10–24–41 |
| Mrs. J. A. Akers | 1–24–41 | 1936 | | 473.65 | 200.00 | 3–11–41 |
| | | | I | 108.20 | 200.00 | 4–8–41 |
| | | | | | 181.85 | 5–9–41 |
| | | | I | 4.77 | 4.77 | 5–9–41 |

two years in an institution of the penitentiary type; on the Fourth Count: $5,000 fine and two years in an institution of the penitentiary type, the sentence under the Fourth Count to run consecutively with that imposed under the First Count. The entire sentence under the Fourth Count was suspended for two years on the condition that the defendant not attempt to transfer title of any of his property until his tax liability with the Government was settled, and that he make a full, fair disclosure of his affairs and assets to the Internal Revenue Agents.

IV. The instant action is one for the recovery of income taxes paid for the years James A. Akers and wife, Mrs. James A. Akers, filed separate, individual income tax returns for the calendar year 1936, each reporting net community income in the amount of $2,365.54 and no tax due. No returns were filed by either James A. Akers or his wife for the years 1932 to 1935, inclusive. On or about December 6, 1940, James A. Akers and wife, acting by and through John Edward Doyle, Attorney in Fact, executed waivers of restrictions on assessment and collection of deficiency in the tax for 1932, 1933 and 1936, respectively. Certified photostatic copies of said waivers were introduced upon the trial of this cause.

On February 4, 1943, claims for refunds were filed for the following years in the amounts designated:

| Claimant | Year Refund Claimed | Amount |
|---|---|---|
| James A. Akers & wife, Lela Akers | 1932 | $540.66 |
| James A. Akers & wife, Lela Akers | 1933 | 571.67 |
| James A. Akers | 1936 | 818.68 |
| Mrs. James A. (Lela) Akers | 1936 | 581.85 |

On September 16, 1943, the Commissioner of Internal Revenue duly rejected said claims and notified such claimants of the action by letter of the same date. Certified photostatic copies of the claims for refund and letters of rejection were introduced upon the trial hereof.

The instant action was instituted on August 24, 1943, prior to the rejection of said claims.

V. The taxes were assessed on money received by J. A. Akers in the following manner:

(a) Mrs. Dora Roberts was and is a very wealthy widow now over 82 years of age. For many years she has owned a ranch in the southeast part of Howard County, Texas, consisting of approximately 36 sections. During the year 1929 H. L. Forrest was on her ranch discussing oil leases with her, during which time she mentioned to him that for many years she had heard there was gold buried on her ranch near a hill called Signal Hill. In 1932 Forrest approached one H. E. Ferguson (the brother of Forrest's wife) and attempted to persuade him to join him in obtaining money from Mrs. Roberts by pretending that they could buy maps, drawings, or waybills in Mexico disclosing the location of buried treasure on the ranch. Ferguson refused to enter into such arrangements.

(b) During the latter part of 1932 Forrest and Akers contacted Mrs. Roberts on her ranch and Forrest introduced J. A. Akers as J. B. Bryant, under which latter name Mrs. Roberts knew him throughout the following transactions. Forrest represented to Mrs. Roberts that Akers (Bryant) had connections in Mexico with people who were in possession of maps which would indicate the exact location of buried treasure on her ranch. Akers and Forrest induced Mrs. Roberts to advance $1600 for the purpose of enabling Akers to go to Mexico and seek to purchase the maps, although at that time they well knew that no such maps were in existence, and that no treasure was buried on the Roberts ranch, and they made the representation solely for the purpose of inducing Mrs. Roberts to part with the said moneys. On or about September 15, 1932, Akers and Forrest returned and represented to Mrs. Roberts that Akers had successfully procured one of the maps. Armed with the map, Akers, Forrest, Mrs. Roberts and her son-in-law, W. G. Garrett, proceeded to the ranch where Akers, after referring to the map, directed the party to a designated spot where they dug up a quantity of metal bars which resembled gold. The bars were taken to the home of Mrs. Roberts in Big Spring, Texas, for safekeeping and it was agreed that she and Akers were to share equally in the proceeds of the sale of all treasure found and which was to be found as a result of information obtained by Akers. It was further agreed that Mrs. Roberts was to bear all expenses in connection with procuring such information, including paying for any maps which were to be procured by Akers or Forrest.

(c) Akers then represented to Mrs. Roberts that he could secure another map disclosing the location of other buried treasure and Mrs. Roberts agreed to purchase the same. Akers left and later returned to Big Spring on or about September 30, 1932, and proceeded to the home of Mrs. Roberts. Akers represented to Mrs. Roberts that he had secured the map at a cost of $4000,

which amount Mrs. Roberts delivered to him. On or about October 1, 1932, Mrs. Roberts, Garrett, Akers and Forrest returned to Mrs. Roberts' ranch and under the direction of Akers, proceeded to a point near Signal Hill where a quantity of metal bars was unearthed. These bars, as before, were taken to Mrs. Roberts' house in Big Spring and concealed in a closet. Shortly thereafter Akers represented to Mrs. Roberts that he could secure another map in Mexico, which map Mrs. Roberts agreed to purchase. Akers then left and returned to Big Spring on or about October 19, 1932, told Mrs. Roberts that he had procured the map at a cost of $8000, whereupon he received such sum from her. The party again proceeded to the ranch where under the direction of Akers they unearthed metal bars which were handled as before. Similar occasions as these heretofore set out occurred on the following dates, and Mrs. Roberts advanced to Akers the amounts indicated:

| Date | Amounts |
| --- | --- |
| December 1, 1932 | $12,000 |
| December 22, 1932 | 7,500 |
| May 1, 1933 | 6,000 |
| August 15, 1933 | 7,000 |
| September 14, 1933 | 10,000 |
| October 13, 1933 | 5,000 |
| October 31, 1933 | 1,600 |
| November 29, 1933 | 4,000 |

(d) On each occasion Akers pretended to have procured a map and under his direction the party proceeded to the ranch where metal bars were dug up. On February 3, 1934, Akers telephoned long-distance from Monterrey, Mexico, to Mrs. Roberts stating that he had obtained another map which could be bought for $6,000. Such amount was delivered to Akers for such purpose. Similar transactions occurred between the parties during the years 1934, 1935 and 1936, and during the years set out below, the following amounts were delivered to Akers by Mrs. Roberts under the same circumstances:

| Year | Amount |
| --- | --- |
| 1932 | $43,100 |
| 1933 | 35,100 |
| 1934 | 97,500 |
| 1935 | 64,000 |
| 1936 | 32,500 |

All of said money so received was divided between Akers and Forrest. Such amounts of money received by Akers were the basis of his alleged income tax liability and the taxes assessed thereon which were paid are sought to be recovered in the present action. The taxes claimed to have been evaded on such money received formed the basis of the criminal action hereinbefore referred to. At all times when Akers represented to Mrs. Roberts that the money advanced by her was to be used to purchase or procure maps from sources in Mexico, he was aware that no such maps in fact existed, and his statements were made for the sole purpose of defrauding Mrs. Roberts of the said money. All moneys received by J. A. Akers from Mrs. Dora Roberts were retained and currently used by him and no part thereof was ever repaid to Mrs. Roberts or paid to anyone else by her order.

(e) The metal bars which were dug up by the parties on the occasions aforesaid were of brass, having a total weight of approximately 5833 pounds. Said bars were, upon the direct order of Akers, made by the Acme Brass and Foundry Company, San Antonio, Texas, at a cost of 18 cents per pound. Prior to the occasion of the parties unearthing said metal bars, Akers would proceed to a location on the Roberts ranch and bury the same. The maps which he pretended to have purchased in Mexico were never seen by anyone save Akers and Forrest and were nothing more than Akers' own memorandum as to where he had buried the metal bars. During February of 1935, Akers told Mrs. Roberts that the "gold" which had been stored in Mrs. Roberts' house could be sold in Galveston. After pretending to have made definite arrangements for the sale of said "gold", Akers, while driving a truck containing the metal, was apparently "hijacked" near Richmond, Texas, and the "gold" stolen. On September 27, 1936, Mrs. Roberts first discovered the fraud and ceased paying any further sums to Akers or Forrest.

(f) Mrs. Roberts felt ashamed of having permitted herself to have been so defrauded and for that reason did not advise any law enforcing authority that she had been defrauded. Mrs. Roberts did not demand

the return of the money she had delivered to Akers or Forrest, did not institute any action, legal or otherwise, for the return of same, and never contemplated any such demand or action. No legal action for the return of any moneys so delivered to Akers or Forrest could have been maintained after September 27, 1938, because the same would have been barred by the two-year Texas Statute of Limitations. Vernon's Ann.St. Art. 5526.

■ The Statute and Regulations here involved read as follows:

Internal Revenue Code:

"Sec. 22. Gross Income

"(a) General definition. 'Gross Income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *" 26 U.S.C. 22, 26 U.S. C.A. Int.Rev.Code, § 22.

Treasury Regulations 103, promulgated under the Internal Revenue Code:

"Sec. 19.22 (a)-1. What included in gross income.—Gross income includes in general compensation for personal and professional services, business income, profits from sales of and dealings in property, interest, rent, dividends, and gains, profits, and income derived from any source whatever, unless exempt from tax by law. (See sections 22(b) and 116 [26 U.S.C.A. Int.Rev.Code, §§ 22(b), 116].) In general, income is the gain derived from capital, from labor, or from both combined, provided it be understood to include profit gained through a sale or conversion of capital assets. * * *"

Plaintiffs contend that this case is ruled by McKnight v. Commissioner, 5 Cir., 127 F.2d 572; and Commissioner of Internal Revenue v. Wilcox et al., 327 U.S. 404, 66 S. Ct. 546, 90 L.Ed. 752, 166 A.L.R. 884. Each of these cases held, in effect, that em-

bezzled funds do not constitute a taxable gain to the embezzler.

In reaching this conclusion, the Fifth Circuit, in McKnight v. Commissioner, supra, 127 F.2d at page 573, laid stress on the fact that the embezzler "got no title, void or voidable, to what he took"; and that "no action or election by the owner is necessary."

The Supreme Court, in the Wilcox case, said, 327 U.S. at page 409, 66 S.Ct. at page 549, 90 L.Ed. 752, 166 A.L.R. 884: "The employer, moreover, at all times held the taxpayer liable to return the full amount. The debtor-creditor relationship was definite and unconditional. All right, title and interest in the money rested with the employer. The taxpayer thus received no taxable income from the embezzlement." And again, 327 U.S. on pages 409, 410, 66 S.Ct. on page 549: "Or had his employer condoned or forgiven any part of the unlawful appropriation the taxpayer might have been subject to tax liability to that extent."

This is not a case of embezzlement; it is one of swindling. When funds are embezzled no title passes. Swindling is defined by the Penal Code of Texas, Article 1545: " 'Swindling' is the acquisition of any personal or movable property, money or instrument of writing conveying or securing a valuable right, by means of some false or deceitful pretense or device, or fraudulent representation, with intent to appropriate the same to the use of the party so acquiring, or of destroying or impairing the right of the party justly entitled to the same."

■ The distinction between theft and embezzlement on the one hand and swindling on the other is that in the former case title to the property acquired never passes, while in the latter case title does pass. State v. Vickery, 19 Tex. 326; Bink v. State, 50 Tex.Cr.R. 445, 98 S.W. 863; Lewis v. State, 75 Tex.Cr.R. 509, 171 S.W. 217; Gordon v. State, 85 Tex.Cir.R. 641, 214 S.W. 980.

James A. Akers acquired from his victim not only the possession but the title to the money here involved. Until this title was divested out of him by court action brought

by the one defrauded, he had the legal right to retain and pass title to his ill gotten gains. That he did do so is admitted. In my opinion, the stipulated facts show conclusively that Akers received the money in question under a claim of right, without restrictions as to its disposition.

Because I am of the opinion that the facts of this case distinguish it from the two cases hereinabove cited; and because of the language of the Supreme Court in the Wilcox case, hereinabove quoted, substantially to the effect that if the employer of the embezzler had condoned or forgiven the unlawful appropriation (as I think Mrs. Roberts did in this case) the taxpayer might have been subjected to tax liability:

I conclude, and it is ordered, adjudged and decreed that the money here involved was taxable income and that the plaintitffs, James A. Akers and Lela Akers, take nothing against Frank Scofield, individually and as Collector of Internal Revenue for the First District of Texas. North American Oil Consolidated Co. v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197; United States v. Wampler, D.C., 5 F.Supp. 796; Kurrle v. Helvering, 8 Cir., 126 F.2d 723; National City Bank of New York v. Helvering, 2 Cir., 98 F.2d 93; Barker v. Magruder, 68 App.D.C. 211, 95 F.2d 122; Caldwell v. Commissioner, 5 Cir., 135 F.2d 488.

Judgment carrying into effect the foregoing findings of fact and conclusions of law will be entered.