ROBERT A. GRAY and ELLEN GRAY, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ALFREDO CARNIATO, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gray v. Commissioner
Docket Nos. 7532-76, 6714-77, 6715-77
United States Tax Court
T.C. Memo 1982-122; 1982 Tax Ct. Memo LEXIS 623; 43 T.C.M. (CCH) 749; T.C.M. (RIA) 82122; March 15, 1982. Theodore A. Sinars,John J. Jiganti, and Dennis E. Frisby, for the petitioners in dkt. No. 7532-76. *624 Henry R. Scheinkman, for the petitioner in dkt. Nos. 6714-77 and 6715-77. Val J. Albright, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Addition to
Addition to
Taxable
tax under sec.
tax under sec.
Petitioner
year
Deficiency
6653(a) [1]
6653(b)
Robert A. Gray
1970
$ 22,940.00
$ 11,470.00
and Ellen
Gray
1971
36,137.00
18,069.00
Alfredo [2]
Carniato
1970
16,224.32
$ 811.21
1971
31,470.65
1,573.53
The issues remaining for our decision are: (1) Whether petitioners Robert and Ellen Gray or petitioner Alfredo Carniato are taxable on certain income; (2) Whether petitioners Robert and Ellen Gray are liable for the addition to tax under section 6653(b); (3) Whether petitioner Alfredo Carniato *625 is liable for the addition to tax under section 6653(a); and (4) Whether assessment is barred by the statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners Robert A. Gray and Ellen Gray were husband and wife residing in Chicago, Illinois on the date the petition was filed. They filed timely joint Federal income tax returns for the taxable years 1970 and 1971 with the Internal Revenue Service Center in Philadelphia, Pennsylvania. Petitioner Alfredo Carniato resided in Pelham, New York at the time of filing his petitions in this case. He filed timely Federal income tax returns for the taxable years 1970 and 1971 with the Internal Revenue Service Center, Brookhaven, New York. Robert Gray was employed in 1966 by General Contracting Services, Inc., (GSC) as a manufacturer's representative. GCS was engaged primarily in the industrial construction business. In 1969, Robert was promoted to executive vice-president of GCS, and a short time later was made assistant to the president. During 1970 and 1971, Robert continued in *626 that position at GCS. His responsibilities included solicitation of business (obtaining contracts for GCS), preparation of bids for various contracts, and overseeing the completion of the work. The Grays lived in Pittsburgh, Pennsylvania, during 1970 and 1971. They later moved to Chicago, Illinois. Alfredo Carniato was employed, beginning in about 1940, by Foster Wheeler Corp. (Foster Wheeler), a large construction concern which, among other things, did work on chemical plants, power plants, generating stations, and oil refineries. He started out as a draftsman for projects relating to the petroleum industry, having taken courses in structural design and having acquired general practical experience working under a structural engineer for 14 years. During the early 1960's, he was promoted to senior buyer, a position he held until his retirement in 1972. His duties in this post included requesting bids from selected subcontractors, checking and verifying the bids when received, and handling overruns after the contracts were awarded. He worked out of Foster Wheeler's Livingston, New Jersey, office. Prior to 1970, Alfredo had contacted Robert several times by telephone to *627 inquire whether GCS was interested in bidding on any work for Foster Wheeler. No contracts were awarded to GCS by Foster Wheeler as a result of these earlier contacts. During the summer of 1970, the two met on at least four occasions and discussed the construction of an oil refinery for Pennzoil United, Inc., at Rouseville, Pennsylvania (hereinafter referred to as the Rouseville, Project). Foster Wheeler had been selected as general contractor for the project. As such, Foster Wheeler accepted bids for various portions of the construction project from different subcontractors. GCS submitted a bid for foundations (excavation and underground piping) and was ultimately successful in obtaining the contract. Sometime during 1970, Alfredo called Robert and said that he was having financial problems and asked if Robert could help. Robert so informed Mr. White, president of GCS, who gave Robert $ 3,000 in cash of GCS funds. Robert flew to the Westchester County Airport where he met Alfredo and gave him $ 1,000 of the money. GCS made this payment not to directly obtain a particular contract from Foster Wheeler but simply to maintain Alfredo's general good will knowing of his important *628 status in handling the subcontracts. Donald B. Smith was president and along with his wife sole shareholder of American Industrial Contracting, Inc. (AIC). The business of AIC is primarily the installation of insulation and sheet metal, specializing in steel mills, chemical plants, power plants and petroleum processing plants. When Donald heard about the Rouseville Project, he contacted Robert for advice on how to obtain a subcontract with Foster Wheeler. Donald and Robert had first met during the mid-1960's when both were doing a job for U.S. Steel in Braddock, Pennsylvania. The two became friends and met on a regular basis in Pittsburgh, Robert's home town. Donald sought Robert's assistance because he knew GCS had been successful in obtaining a contract from Foster Wheeler and that Robert was acquainted with Alfredo, who was the senior buyer assigned to the Rouseville project. Robert agreed to help and he called Alfredo to tell him what he knew of AIC--that they did excellent work and were financially responsible. Robert asked whether Foster Wheeler could give AIC some consideration in the Rouseville work, and Alfredo replied that he would certainly consider AIC but "It'll *629 cost." To those on the outside, such as Donald and Robert, it appeared that Alfredo had full control over selection of awards for the refinery. Donald therefore decided to go ahead and pay Alfredo since it was worth it to him to get the job, and because he felt it would be the only way to obtain a contract. It was subsequently agreed that a "commission" would be paid in an amount equal to 10 percent of the contract price. Alfredo instructed Donald to hold his bid until the other bids were filed. Alfredo would then let Donald know the lowest price so Donald could submit a lower bid. Donald was skeptical. He didn't trust Alfredo entirely and was afraid that if AIC did not submit a timely bid they would have no chance at the job. AIC went ahead without waiting and submitted a bid for the installation of piping and vessels to Foster Wheeler. The bid seemed to all concerned (except apparently those at AIC) "ridiculously low." Alfredo caused the competitors' bids to be transmitted to Donald through Robert so he could see how far off AIC was. Donald, however, still refused to believe that his own personnel could have made such a gigantic error, and although Foster Wheeler (through *630 Alfredo) had agreed to allow AIC to reform its bid, Donald was "leery" of doing so without further confirmation of the actual bids of his competitors. In order to reassure Donald, Alfredo gave Robert his "spread sheet" which contained summaries of the bids made by the various companies for the installation of insulation on the Rousdeville project. The spread sheet was prepared by Alfredo and was to be kept strictly within the Foster Wheeler concern. Alfredo instructed Robert to show the sheet to Donald, which he did, but not to copy it or let it out of his possession. Robert was to return the spread sheet by hand carrying it to an office which Foster Wheeler maintained at 666 Fifth Avenue, New York, New York, where he was to address it to the attention of Alfredo Carniato and leave it in the mail room. Robert, however, never returned the spread sheet. When Donald saw the spread sheet he was finally convinced that his bid was in fact too low and that Alfredo was not trying to entrap him. Consequently, he became willing to revise AIC's bid. With Alfredo supplying information as to how the competitors had bid in each specific area and suggesting the appropriate figures to be *631 used, AIC submitted a revised bid totalling $ 1,100,000. On October 21, 1970, Alfredo called Donald and told him AIC's bid had been accepted. AIC was formally notified by telegram on October 22, 1970, that Foster Wheeler had decided to award them the insulation contracts based on their second bid. This award was subsequently confirmed by a purchase order from Foster Wheeler sent on November 20, 1970. Since the contract was set for $ 1,100,000, and a 10 percent "commission" had previously been agreed to, the problem became how to liquidate the resulting $ 110,000 obligation, which Alfredo insisted be paid in cash. Alfredo initially demanded all of the money in advance, but Donald replied that it would be impossible due to a lack of funds. It was finally decided that there would be an initial $ 30,000 payment followed by eight equal payments of $ 10,000. In order to meet these demands, the following checks were drawn on the account of AIC: Date
Date
Payee
Endorser
Amount
Paid
10/20/70
Cash
Donald B. Smith
$ 30,000
10/22/70
11/27/70
Cash
J. Albert Eastland
10,000
12/16/70
1 /14/71
Donald B. Smith
Donald B. Smith
10,000
1 /14/71
2 /17/71
Donald B. Smith
Donald B. Smith
10,000
2 /17/71
3 /12/71
Donald B. Smith
Donald B. Smith
10,100
3 /12/71
4 /16/71
Donald B. Smith
Donald B. Smith
10,000
4 /16/71
5 /18/71
Donald B. Smith
Donald B. Smith
10,100
5 /18/71
6 /18/71
Donald B. Smith
Donald B. Smith
10,000
6 /18/71
9 /23/71
Cash
J. Albert Eastland
10,000
9 /24/71
*632 J. Albert Eastland was a vice-president of AIC. Alfredo furnished Donald with two blank invoices to assist AIC in recording the cash payments on their books and records. These invoices were titled "International Sales and Engineering, 666 Fifth Avenue, New York, 10019. Tel: 212-581-7778." On both, AIC's name and address was typed in after "TO:", and after "For Services Rendered:" was typed "Commission and Sales expenses for Pennzoil United Contract." One invoice, dated October 16, 1970 and carrying the amount $ 30,000, was stamped received October 18, 1970, and noted payment on 10/20/70 by check 5997 (which corresponds to one of the aforementioned checks). The other receipt was dated November 5, 1970 in the amount of $ 10,000, was stamped received November 8, 1970, and noted payment on 11/27/70 by check 6176 (which again corresponds to one of the aforementioned checks). These payments were reflected on AIC's books as commissions and sales. None of the money was actually paid to International Sales and Engineering, however, but rather was paid to Robert Gray for transmittal to Alfredo Carniato. There has never been a tenant at 666 Fifth Avenue, New York, called International *633 Sales and Engineering. Foster Wheeler, however, did have an International Sales division at that address during the years in issue. On or about the dates listed above, Robert received the aforementioned amounts of cash delivered to him in all but one case by Donald (the September 23, 1971 payment was delivered by Eastland). The transactions were accomplished by either Donald or Eastland cashing the AIC check, putting the money into a briefcase, and taking it to a prearranged delivery point in Pittsburgh where it would be handed over to Robert. Alfredo had insisted that Robert was to serve as an intermediary in these transfers. Although Donald gave the money to Robert, Robert told him the money was going to be transmitted to Alfredo. To make such large payment, AIC depended upon prompt receipt of progress payments from the subcontract with Foster Wheeler. Whenever AIC was late in making a "commission" payment, Alfredo would telephone AIC to inquire about the reason for the delay and to insist upon prompt payments. Alfredo would also call Robert every day from the due date until the payment was finally made. No threats, physical or otherwise, were ever made. Alfredo, however, *634 would insist upon an additional $ 100 in order to make certain that Foster Wheeler sent the progress payment out on time. This extra $ 100, or "washer" as Alfredo called it, was added to two of the checks as listed above. On one occasion Alfredo insisted upon expediting the commission payment. Since Eastland was going to New Jersey on business, Alfredo asked Eastland to bring the payment with him. Eastland wrote out an AIC check payable to Mr. A. J. Carniato and delivered it to Alfredo. When the check was handed to him, Alfredo refused it saying that he could not take a check. Since Eastland didn't bring cash with him, Alfredo suggested that Eastland write another check, this time making it payable to International Sales and Engineering. Eastland wrote this second check when he got back to the office, and mailed it to Alfredo. AIC's records show that payment on this check was stopped. Alfredo insisted that Robert personally deliver the money to him in New York. Robert demanded payment for these services, and it was agreed he would receive 5 percent of Alfredo's gross, or $ 5,500. It was further agreed that Robert would receive his share only after Alfredo had collected *635 half of the money. Additionally, Robert was allotted $ 100 from each payment for his out-of-pocket expenses in traveling to and from New York. Robert realized that although he had promised to deliver the money to Alfredo in New York, he actually would not have to time to do so. So Robert decided to utilize his wife, Ellen, as a courier since she had family in Connecticut and friends in New York whom she could visit. He took her with him on his first delivery to New York in order to familiarize her with the procedure and so that she might personally observe Alfredo in order to recognize him in the future. Robert and Ellen flew from Pittsburgh to New York on October 23, 1970 to make the first $ 30,000 cash payment to Alfredo. The exchange took place at LaGuardia, airport. Ellen remained in the waiting room, but she observed as Robert met and conversed with Alfredo. Afterwards, the Grays went into Manhattan where they spent the nights of the 23rd and the 24th at the St. Regis-Sheraton Hotel before flying back to Pittsburgh on October 25th. Robert made the first delivery and possibly one or two more. The rest were made by Ellen. At first he did not reveal to her the contents *636 of the envelopes she was instructed to deliver. She thought they contained business documents. Later he told her they contained cash, but not the precise amount. Ellen's first meeting with Alfredo took place at a Howard Johnson's restaurant off the Connecticut turnpike. They talked for about a half hour. When Ellen revealed that she worked as a volunteer with the opera in Pittsburgh, Alfredo told her that he shared her interest as he was himself a professional opera singer and an opera buff. Airline tickets reveal that the following trips were made by the Grays during 1970 and 1971: Date Ticket
Point of
Departure
Return
Purchased
Traveler
Departure
Date
Destination
Date *
10/23/70
Robert
Pittsburgh
10/23/70
New York
10/25/70
10/23/70
Ellen
Pittsburgh
10/23/70
New York
10/25/70
12/13/70
Ellen
Pittsburgh
12/13/70
New York
None
1 /14/71
Ellen
Pittsburgh
1 /14/71
New York
1 /15/71
2 /16/71
Ellen
Pittsburgh
2 /17/71
New York
2 /19/71
3 /12/71
Ellen
Pittsburgh
3 /15/71
New York
3 /17/71
4 /15/71
Ellen
Pittsburgh
4 /17/71
New York
4/ 21/71
5 /17/71
Ellen
Pittsburgh
5 /18/71
New York
Open
6 /13/71
Ellen
Pittsburgh
illegible
New York
Open
7 / 8/71
Ellen
Pittsburgh
7 /12/71
New York
Open
8 / 5/71
Ellen
Pittsburgh
8 /10/71
New York
8 /10/71
9 /19/71
Ellen
New York
9 / 9/71
Pittsburgh
9 /25/71
Ellen
Chicago
9 /27/71
New York
Open
11/ 3/71
Ellen
Pittsburgh
11/ 4/71
New York
Open
12/ 4/71
Robert
Pittsburgh
12/ 5/71
New York
Open
*637 The 1971 meetings generally took place at LaGuardia airport. Alfredo would walk with Ellen from the gate to the baggage area. Alfredo would tell Ellen of his problems, and she would deliver the envelope to him. Alfredo was ill with a heart condition in 1971, and had to be hospitalized during the following dates: May 30, 1971 - June 17, 1971; June 24, 1971 - July 8, 1971; August 16, 1971 - August 25, 1971. Upon hearing of his initial period of hospital confinement, Robert suggested Ellen buy Alfredo a gift. Remembering Alfredo's interest in the opera, she bought him a book entitled "Book of the Operas" and sent it to him at the hospital. The book was purchased on June 4, 1971. The Grays never sent a copy of this book to anyone other than Alfredo. During February of 1971, Robert reminded Alfredo that since one-half of the payment had already been made he was now entitled to his 5 percent fee. Alfredo said he could not afford to pay him all at once. It was therefore agreed that Robert would receive $ 1,500 per month, commencing with the February 1971 payment. Robert paid himself according to this schedule by simply taking *638 the money of the envelopes prior to their delivery. Sometime in March of 1974, Alfredo was contacted and interviewed about the 1970-1971 payments by Mr. Edward D. Virostek, a special agent with the Internal Revenue Service. Sometime prior to April 9, 1974, Robert was also contacted by the Internal Revenue Service concerning the cash payment. After Robert's first contact with the Internal Revenue Service, Alfredo called Robert to advise him that he, Alfredo, had been contacted. The Grays received the following letter dated April 10, 1974, and postmarked April 12, 1974 at Bronx, New York: Dear Bob & Ellen, Sorry to be again the bearer of bad news. Last time I saw you was at my Sister In Law's funeral in New York.
"Please" call me immediately from an outside phone, regarding death of a very dear friend. Extremely important.
Thank you once again for the "Book of the Operas"
(914) Pe-8-0696 - from 6: P.M. The letter was unsigned. The phone number given in the letter was at the time in question listed in the name of F. Murzi, 305 6th Avenue, Pelham, New York. Alfredo then resided at 19 Third Avenue, Pelham, New York. Robert and Ellen immediately assumed *639 the letter had been sent by Alfredo, since the facts contained therein were known only by him. Robert showed the letter to his attorney who advised Robert not to call. On their 1970 joint Federal income tax return, the Grays reported no portion of these payments as income. On their 1971 joint Federal income tax return, the Grays reported only the $ 5,500 received from Alfredo as fees for transporting the money to New York and otherwise serving as intermediaries in these transactions as "Miscellaneous income-other commissions." Alfredo reported no income as a a result of these payments on his Federal income tax returns for 1970 and 1971. In his statutory notice of deficiency mailed to the Grays on May 13, 1976, respondent determined that the Grays had received unreported income of $ 40,000 for the 1970 taxable year and $ 64,600 during the taxable year 1971. Respondent further determined that the Grays were liable for the addition to tax under section 6653(b) in respect to the deficiencies for both years. On April 15, 1977, respondent mailed separate notices of deficiency to Alfredo for the taxable years 1970 and 1971. Respondent determined therein that Alfredo had failed *640 to report income of $ 41,000 for 1970 and $ 70,100 for 1971. Respondent further determined that the addition to tax under section 6653(a) was appropriate as to the deficiencies for both years. OPINION A. Understatement of Income
There is no dispute over the fact that Robert Gray received $ 110,000 in cash from AIC during the two-year period in question. The Grays, however, insist that they served only as conduits between AIC, the payor, and Alfredo Carniato, the ultimate recipient. They claim to have retained for their own benefit only the $ 5,500 fee which they collected for serving as intermediaries (which sum was reported on their 1971 Federal income tax return), and the $ 100 which they withdrew from each payment to cover their out-of-pocket traveling expenses. Alfredo claims that he never made arrangements to receive any money from anyone at AIC in return for the award of a subcontract by Foster Wheeler, that he never received any cash payments from either Robert or Ellen Gray during 1970 or 1971, and that in fact he never even met Ellen Gray. Alfredo also denied having furnished any bidding information to either Gray or AIC, and claims further that his position *641 at Foster Wheeler was not one which would have enabled him to determine who would receive a contract award. [3]
We have carefully considered the testimony of the witnesses as well as all other evidence presented and we have found the facts as set forth above. Accordingly, we hold that the Grays served merely as conduits, and that it was Alfredo Carniato who was the intended and actual recipient of these monies. We are persuaded by several factors which collectively leave little doubt that the Grays indeed passed the money along to Alfredo Carniato. Donald Smith and J. Albert Eastland (both of whom testified at trial) had direct contact with Alfredo on numerous occasions concerning delays in payment of the "commissions." Either Robert or Ellen Gray or both flew from Pittsburgh to New York on dates corresponding closely to those on the AIC checks used to generate the cash payments. Most telling, however, is that Robert Gray was not employed by Foster *642 Wheeler, the general contractor, and thus wasn't in a position of influence. Alfredo, on the other hand, even if not personally making the selection of subcontractors, nonetheless could determine or "fix" the outcome by his access to the competitive bidding information, as he did. It was Alfredo who furnished the critical bidding information which allowed AIC to make the lowest bid. Finally, there were just too many inconsistencies in Alfredo's story to find it credible. On the other hand, we found petitioners and all of their witnesses to be sincere and forthright. We therefore cannot accept Alfredo's version that he had nothing whatsoever to do with any of this. As to Alfredo Carniato, there can be no question that the money which he collected constitutes gross income. Whether we categorize these receipts as compensation for services or commissions, section 61(a)(1), or as bribes or "kickbacks" paid to obtain a desired contract ( Caldwell v. Commissioner,135 F.2d 488 (5th Cir. 1943); see also, Cain v. Commissioner,460 F.2d 1243 (5th Cir. 1972), affg. a Memorandum Opinion of this Court; United States v. Wyss,239 F.2d 658 (7th Cir. 1957); *643 United States v. Bruswitz,219 F.2d 59 (2d Cir. 1955)), they represent taxable income. By no stretch of the imagination can we consider these payments as gifts required to be made out of "detached and disinterested generosity," Commissioner v. Duberstein,363 U.S. 278 (1960), where a $ 1,100,000 contract hung in the balance. Donald Smith and Alfredo Carniato did not even know each other before these arrangements were made. Nor was the $ 1,000 which we find Alfredo received from Gray as a representative of GCS a gift or anything other than taxable income. B. Statute of Limitations
Under the general rule of section 6501(a), assessment must take place within 3 years after the return is filed. Early returns (those filed prior to the due date) are deemed to have been filed on the last day prescribed by law for filing the return. Section 6501(b)(1). The statute of limitations begins running the following day. Burnet v. Willingham Loan & Trust Co.,282 U.S. 437 (1931). The Grays filed their 1970 return on or before April 15, 1971 and their 1971 return on or before April 15, 1972. The normal 3-year period for assessment *644 therefore expired on April 15, 1974 and April 15, 1975 for the two years, respectively. Respondent mailed a statutory notice of deficiency covering both 1970 and 1971 to the Grays on May 13, 1976, well after the normal statute of limitations on assessment had expired. Similarly as to Alfredo Carniato, who filed his 1970 return on or after April 15, 1971, and his 1971 return on or before April 15, 1972, the general limitations period expired on April 15, 1974 and April 15, 1975 for 1970 and 1971, respectively. Separate notices of deficiency for 1970 and 1971 were both mailed on April 15, 1977, again far after the statutory period had elapsed. Respondent relies, however, on section 6501(e), which provides an exception to the general 3-year limitation period in cases involving substantial omissions from income, since in each case the deficiency notice was mailed within 6 years of filing. Section 6501(e) provides in relevant portion: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (e) SUBSTANTIAL OMISSION OF ITEMS.--Except as otherwise provided in subsection (c)-- (1) INCOME TAXES.--In the case of any tax imposed by subtitle A-- (A) GENERAL RULE.--If the taxpayer *645 omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph-- (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; or (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item. In applying this section it is imperative to ascertain (1) the amount of gross income stated on the return and (2) what amount, if any, which was properly includible in gross income was omitted from the return. Based on our finding above *646 that Alfredo, and not the Grays, is taxable on the payments made by AIC, we need not determine whether section 6501(e) would apply to the Grays since they would not be liable for tax in any event. [4] As respects Alfredo, we have calculated the omission ratios for each year involved: (a) Gross income
(b) Amount includible [5]
Year
stated on the return
which was omitted
1970
$ 13,049.37
$ 40,800
1971
12,957.92
64,000
*647 Since the omissions are greatly in excess of 25 percent, we hold that the 6-year statute of limitations applies to Alfredo's returns for both 1970 and 1971, and therefore assessment is not prohibited. C. Additions to Tax
1. Section 6653(b): The Grays Respondent conceded on brief that if we find the money to have been received by Alfredo with the Grays serving only as conduits, as we have done, they should not be held liable for the civil fraud addition. 2. Section 6653(a): Alfredo Where any part of any underpayment is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there is to be added to the tax an amount equal to 5 percent of the underpayment. Section 6653(a). There is ample evidence contained in the record t establish that--at the minimum--Alfredo intentionally disregarded the rules and regulations. He supplied fictitious invoices to AIC in order to conceal the identity of the recipient of their payments. He insisted on receiving cash payments, presumably in part to make it easier to avoid taxation. All in all, Alfredo's conduct was at the very least negligent. Decision will be entered for the petitioners *648 in dkt. No. 7532-76.
Decisions will be entered under Rule 155 in dkt. Nos. 6714-77 and 6715-77.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years here in in issue, unless otherwise indicated. ↩
2. These cases were ordered consolidated for purposes of trial, briefing, and opinion.↩
*. All return flights were to Pittsburgh.↩
3. Alfredo failed to appear at trial, as did his attorney. He further failed to file briefs. We will therefore treat his position as resting on the evidence as presented, including a pretrial deposition given by Alfredo.↩
4. Respondent concedes on brief that if we should find that Alfredo received the income there will be no deficiency in the Gray's tax for 1970 and 1971.↩
5. Respondent appears to concede in his brief that to the extent the Grays withdrew money from the AIC payments prior to passing them on to Alfredo, Alfredo will not be taxed on those amounts. This concession can be viewed in either of two ways: (1) Alfredo should be taxed only upon what he actually received, or (2) Alfredo constructively received the entire amount through his agents, the Grays, but is entitled to an offsetting deduction for expense reimbursements and commissions. Cf. Commissioner v. Sullivan,356 U.S. 27 (1958). Accepting this concession, we find that Alfredo omitted the following amounts: ↩
Less Amount Retained
Total Payments
by the Grays
Amount Taxable
1970
$ 41,000
$ 200
$ 40,800
1971
70,200
6,200
64,000