LUTHER R. PATTON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Patton v. Commissioner
Docket No. 782-78.
United States Tax Court
T.C. Memo 1985-148; 1985 Tax Ct. Memo LEXIS 485; 49 T.C.M. (CCH) 1068; T.C.M. (RIA) 85148; March 27, 1985. Albert Sidney Johnston, Jr., for the petitioner. Robert W. West and Katherine S. Weed, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes: Year
Deficiency
[1] Sec. 6653(b) 1968
$27,391.17
$13,695.59
1969
35,158.24
17,579.12
1970
20,132.06
10,066.03
This is a fraud case involving whether or not petitioner received payoffs and kickbacks and paid sham salaries to political cronies while serving as the elected sheriff and tax collector of Harrison County, Mississippi. In addition to respondent's determination of underreported income and overstated salary deductions, there are also issues as to petitioner's *487 claimed loss in 1968 from an equipment leasing venture and petitioner's claimed deduction in 1969 for an automobile insurance premium. Respondent denied both the loss and insurance deduction for lack of substantiation. Unless respondent proves fraud, the statute of limitations will preclude assessment and collection of any deficiencies for the years in question. Sec. 6501(a), (c)(1). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Gulfport, Mississippi at the time he filed his petition in this case. Petitioner's wife, Florence H. Patton (Mrs. Patton), originally filed a separate income tax return for the taxable year 1968. She later filed an amended Federal income tax return to cancel her separate return in order to file a joint return with petitioner. Petitioner *488 and Mrs. Patton then filed an original joint Federal income tax return and a subsequent amended joint return for the year 1968, and joint Federal income tax returns for the years 1969 and 1970, with the Internal Revenue Service Center at Chamblee, Georgia. Mrs. Patton is not a party to this case. During the years at issue in this case, petitioner was the elected sheriff and tax collector of Harrison County, Mississippi. Petitioner had unsuccessfully sought election as sheriff in 1963. He ran again in 1967, was elected, and took office in January of 1968. In 1968 petitioner also operated a farming business and during that year also became a partner in an equipment leasing venture with one E.E. Ladner. As sheriff, petitioner was the chief law enforcement officer of Harrison County and was also the tax collector. He operated two distinct offices to carry out these functions. The sheriff's office involved operating the county jail, hiring and supervising deputy sheriffs, and maintaining law and order in the county. The tax collector's office involved collecting county and state taxes (except income and sales taxes) and making proper distribution of these tax receipts. Petitioner's *489 offices were located in two adjoining buildings in Gulfport, Mississippi. During the years in issue, a Mississippi sheriff ran his office much like an ordinary private business, i.e., sole proprietorships. The sheriff was to collect the taxes and maintain law and order. He received fees for conducting these activities. The fees came partly from tax collections and partly from a percentage of fines levied for criminal offenses. The sheriff also personally received a salary from the county. The sheriff was expected to operate his office (pay employees, purchase automobiles, supplies, etc.) from the fees he made for collecting taxes and from fines. Petitioner's books and records as sheriff and tax collector were maintained by J.C. McGuire (McGuire), petitioner's chief office deputy (primarily for tax collection but some law enforcement work). McGuire prepared summaries of petitioner's monthly gross receipts from the operation of the offices of sheriff and tax collector. Additionally, schedules of the salaries petitioner paid as sheriff and tax collector were prepared. Charles P. Logan (Logan), a Certified Public Accountant (C.P.A.), was petitioner's accountant. Logan used *490 the summaries of petitioner's gross receipts prepared by McGuire and the salary schedules in preparing petitioner's 1968, 1969, and 1970 joint Federal income tax returns. Petitioner's returns for the years in issue reported gross receipts from the operation of the offices of sheriff and tax collector on a Schedule C (Profit (or Loss) From Business or Profession). Included in the 1969 Schedule C gross receipts were $12,107, identified as dozer rental, timber sales, and other miscellaneous income. Included on the 1970 Schedule C was $296.93 of miscellaneous income.Petitioner's returns for each year separately reported the salary payments he received from the Harrison County Board of Supervisors, payments evidenced by Forms W-2. Petitioner's books as sheriff and tax collector were periodically audited by state agents, and the auditors were satisfied with petitioner's records. None of the unreported income determined by respondent in this case involved public monies. There are no allegations that petitioner misappropriated public monies or other monies coming into his possession through the ordinary operation of the offices of sheriff and tax collector. Petitioner's books as sheriff *491 and tax collector are involved in this case only in the matter of possible overstatement of salary payments to certain individuals. On the salary issues, there is no dispute that the payments were in fact made, but only disputes as to whether the payments were compensation for services actually rendered and reasonable in amount. Unreported Income
Payoffs
Before and during the years petitioner was the sheriff of Harrison County, there was a type of coin-operated machine, known variously as a Bally in-line pinball machine or bingo machine. This machine could be used for amusement purposes or used for gambling purposes. The machine's operation for nongambling purposes was legal under state and Federal law, but its operation for gambling purposes was illegal. However, the operation of these pinball machines for gambling purposes was widespread on the Mississippi Gulf Coast, and there was no real attempt to hide the gambling from law enforcement authorities. The existence of this gambling was common knowledge in Harrison County. A number of persons operated such pinball machines for gambling purposes, including Clarence and Arnold Alston (the Alstons), James Ware *492 (Ware), Harold Burt (Burt), Anthony Ingrassia (Ingrassia), Tony Quanica (Quanica), Joseph Taranto (Taranto), and Johnny Bertucci (Bertucci). Petitioner took office as sheriff on January 1, 1968, after having campaigned for office on an anti-gambling platform. His publicly-stated position against gambling was well known throughout his term of office. However, as discussed below, petitioner's enforcement of gambling laws with respect to the pinball or bingo machines during his term of office was far different from his publicly-stated position. Two or three months after taking office, petitioner ordered a raid one weekend on various business establishments, resulting in the seizure of many of the bingo machines. The primary purpose of this raid was to enable petitioner to identify the numbers and locations of the bingo machines operating within the county. After petitioner had confiscated the machines, he met with the various operators whose machines had been seized. At these meetings, petitioner told the operators his terms for them to recover their machines and to be permitted to continue operating the machines for gambling purposes. Generally, petitioner demanded from the *493 operators $15 to $20 per month per machine. In one instance, petitioner agreed to accept a lesser, fixed sum from Burt and deferred the payoffs approximately 10 months to permit Burt to recoup the cost of one of his machines, which had been accidentally destroyed during the raid. Petitioner informed the operators that Ware, one of petitioner's political supporters during the recent election campaign, would pick up the monthly payments from them. Petitioner also required payment of cash up front by some, if not all, of the operators as a condition to his release of the pinball machines, demanding amounts approximately equalling the total monthly payments "accrued" from his assumption of office until the time of the raid. For his services as the "satchel" or "bag" man, Ware was permitted to operate his pinball machines without having to make the monthly payoffs petitioner demanded from the other operators. Ware did not begin operating any bingo machines until after petitioner's raid on the other operators early in 1968. Throughout the remainder of 1968, and all of 1969 and 1970, Ware collected the monthly payoffs in cash from the Alstons, Ingrassia, Quanica, Taranto, and Bertucci, *494 and delivered the money to petitioner. Burt, however, made his monthly payments directly to petitioner himself. [2] In exchange for these payoffs, petitioner agreed not to interfere with the operators' gambling activities. Petitioner made no further raids on the machine operators during the rest of his term as sheriff of Harrison County. Unhindered by petitioner's law enforcement officials, the various operators continued their gambling activities until 1971, when the Federal Bureau of Investigation (FBI) seized most, if not all, of the bingo pinball machines in Harrison County. On his joint returns with Mrs. Patton for the years in issue, petitioner reported *495 none of the payoffs he received from the pinball machine gambling operators. Kickbacks
At the time petitioner was elected sheriff, Mississippi law authorized the sheriff to appoint the bail bondsmen for his county. Prior to his election campaign, petitioner became acquainted with John Allen Gill (Gill). Gill agreed to support and did support petitioner in his campaign, in exchange for which petitioner agreed to try to give Gill the bail bonding business in Harrison County. After petitioner was elected sheriff, he appointed Gill as the bail bondsman in Harrison County, and for several months, Gill was the only bail bondsman in the county. Several months after appointing Gill, petitioner told Gill that he was appointing Earl Owen as bail bondsman, to be Gill's partner in the bail bonding business, because Earl Owen had supported him in his campaign and he had to find some way to repay Earl Owen for his help. Thereafter, Earl Owen and Gill operated the bail bonding business in Harrison County as a partnership. They were the only two bondsmen in Harrison County during the years in issue. Several months after his election, petitioner informed Earl Owen and Gill that, in *496 order for them to continue operating as bail bondsmen, they were each going to be required to pay him $150 per month. Either Earl Owen or Gill each month paid petitioner personally the $300, usually in cash. On many occasions, petitioner simply put the money into his pocket. These payments continued approximately three years. Petitioner's stated reason for receiving these payments was to pay a $300 monthly salary to Ed Owen, apparently Earl Owen's brother. Petitioner told Earl Owen and Gill that he could not afford to place Ed Owen on the sheriff's department payroll but Ed wanted to continue as a deputy sheriff to avoid a break in service for retirement purposes. However, aside from petitioner's representations, Earl Owen and Gill did not know the purpose for which petitioner used the monthly payments. Petitioner did not report that money as income on his own tax returns for the years at issue, and there is no indication that the money was ever included in the gross receipts of the sheriff's office. However, salary for Ed Owen was deducted in the amounts of $3,600 in 1968, $3,600 in 1969, and $1,500 in 1970. Ed Owen died in May of 1970. Thereafter, Earl Owen and Gill continued *497 to make their monthly payments of $150 each to petitioner. Earl Owen and Gill made payments to petitioner until such time as they were licensed by the State of Mississippi as professional bail bondsmen, late in 1970 or early in 1971. Petitioner received at least $2,700 from Earl Owen and Gill in 1968, and at least $3,600 from them in 1969 and in 1970. Earl Owen and Gill made the payments in order to continue in business as bail bondsmen, and they did not regard any part of the payments as campaign contributions for any political race by petitioner. Petitioner did not report these payments on his joint returns with Mrs. Patton for the years in issue. Respondent determined that from the various payoffs from the gambling machine operators and the kickbacks from the bail bondsmen, petitioner had received and failed to report the following amounts of income: Year
Amount
1968
$28,100
1969
22,800
1970
17,000
Petitioner kept no books or other records regarding his income from payoffs and kickbacks during the years in issue. Disallowed Salaries
In his statutory notice of deficiency, respondent disallowed some of the salary deductions claimed by petitioner *498 on his Schedule C's as follows: 1968
1969
1970
Claimed
Disallowed
Claimed
Disallowed
Claimed
Disallowed
L. S. Broadus
$6,000
$ 6,000
$6,000
$ 6,000
$6,000
$ 6,000.00
Maxie Broadus
12,000
12,000
12,000
12,000
12,000
0
R. Hart Chinn
1,800
1,800
1,800
1,800
1,800
1,800.00
Ed Owen
3,600
3,600
3,600
3,600
1,500
1,500.00
G. L. Pemberton
6,000
3,000
6,000
3,000
6,000
3,000.00
Ronnie Patton
3,600
1,800
3,700
1,850
2,925
1,462.50
Hunter Patton
3,600
1,800
3,700
1,850
3,174
1,587.00
Delores Patton
1,600
1,600.00
Faye Patton
2,350
2,350.00
J. R. Flynt
287
287
Total Disallowed
$30,000
$30,387
$19,299.50
Respondent now concedes that the salaries petitioner paid to his son, Ronnie Patton, and to his daughter-in-law, Faye Patton, are deductible in full as claimed. L. S. Broadus
L. S. Broadus was a long-time political supporter of petitioner and had employed petitioner from 1963 to 1967. During petitioner's term as sheriff, L. S. Broadus was between 71 and 75 years old. L. S. Broadus had a farm in Stone County, approximately three miles north *499 of the Harrison County line. Petitioner paid L. S. Broadus $500 per month during the years in issue, which he charged to the sheriff's department payroll account. Respondent disallowed all of petitioner's claimed deductions for salary payments to L. S. Broadus. Petitioner contends that L. S. Broadus rendered services patrolling the outlying county areas against cattle rustlers, but L. S. Broadus in fact rendered few, if any, services to the sheriff's office. Maxie Broadus
Until July 1969, Maxie Broadus (Maxie) was the chief of detectives for the City of Gulfport Police Department, a full-time job. His employment with the City of Gulfport ended shortly before Hurricane Camille hit the Mississippi coast in mid August of 1969. After the hurricane, he spent two or three months clearing debris from a farm he and his brother owned. After he cleared his own property, he spent another two or three months clearing the farm property owned by petitioner. Early in 1970, Maxie began working full time for petitioner as assistant sheriff at a salary of $12,000 a year. Sometime previous to petitioner's own term of office, Maxie had served as the Harrison County sheriff. During the *500 1967 election, petitioner had asked Maxie for his political support, indicating that Maxie's failure to support him in 1963 had contributed substantially to his defeat at that time. Petitioner offered Maxie $1,000 per month to induce Maxie to support him and help him get elected. Petitioner stated that he would pay the money to Maxie even though Maxie was already employed by the City of Gulfport. Maxie did support petitioner in the 1967 election campaign, attending rallies for petitioner and talking to various individuals to influence them to vote for petitioner. After petitioner was elected as sheriff of Harrison County, he began paying Maxie $1,000 per month as promised. Petitioner charged the expense to the sheriff's department payroll account. In 1968 and 1969, Maxie considered the money he received from petitioner to be payment in fulfillment of petitioner's commitment to him to pay $1,000 per month for his campaign support. When Maxie began work for the sheriff's department in 1970, the $1,000 per month was paid to him as his salary. As chief of detectives for the City of Gulfport Police Department, Maxie had access to certain information concerning law enforcement activities, *501 which he provided to petitioner as Harrison County sheriff. This information included tips Maxie received concerning crimes committed in the county, informant's statements, the location of certain individuals, and similar data. Most of the information that Mexie gave to petitioner was in the nature of routine intergovernmental cooperation between the various arms of the law enforcement community. The majority of the information was given to petitioner over the telephone. Maxie was also at the Harrison County jail often because the City of Gulfport kept its prisoners at the county jail, having no jail of its own at that time. Any services rendered by Maxie to the Harrison County sheriff's office in 1968 and 1969 were minimal; the $12,000 per year payments to him in those years were political payoffs rather than compensation for services rendered. Respondent disallowed all of petitioner's claimed deductions for Maxie's salary in 1968 and 1969, but allowed the $12,000 amount claimed in 1970 when Maxie actually worked full time for the Harrison County sheriff's office. R. Hart Chinn
During the years in issue, Mississippi law required the sheriff or one of his deputies to *502 be present to open the meetings of the county board of supervisors. The board of supervisors had regular meetings twice a month and special meetings occasionally. During these years, petitioner paid R. Hart Chinn (Chinn) a salary of $150 per month for services as a deputy sheriff, solely to be his representative at the board meetings. While working for petitioner as deputy, Chinn was between 76 and 80 years old. Chinn had been politically active in Harrison County for most of his life, having been elected to various offices, including county sheriff and mayor of Biloxi. Chinn commuted from Biloxi to Gulfport to attend the board of supervisors' meetings. Chinn spent most of his time trying to unearth unfavorable information about one of his former political foes. Respondent disallowed all of petitioner's claimed deductions for Chinn's salary. Ed Owen
Ed Owen owned and operated a night club in Saucier, Mississippi, in north Harrison County. Ed Owen, a former police officer, had supported petitioner in his 1967 campaign. Ed Owen had requested that petitioner put him on the payroll in order to continue his time-in-service for a civil service pension that he hoped to obtain *503 in the future, as discussed earlier in connection with the kickbacks from the bail bondsmen. Ed Owen was not assigned to any regular duties as a deputy sheriff, although he occasionally patrolled with other officers in north Harrison County and was available in the event of an emergency. There were large numbers of unpaid, volunteer deputy sheriffs in Harrison County during the years before the Court and the record does not show that Ed Owen rendered as much service as the unpaid, volunteer deputies and most of his services centered around the operation of his own night club. Petitioner paid Ed Owen $300 per month as salary from the beginning of 1968 until his death in May of 1970. Respondent disallowed all of petitioner's claimed deductions for salary payments to Ed Owen. Rev. G. L. Pemberton
During the years in issue, Rev. Pemberton was Pastor of the Grace Temple, a Gulfport church. The church had Sunday morning and Sunday night services, Sundary School and a Wednesday night prayer meeting. In addition to his regular duties for the church, Rev. Pemberton also provided typical pastoral services to his congregation, such as weddings, funerals, hospital visits, and counseling. *504 The Grace Temple also sponsored a daily 15-minute radio program broadcast over a Gulfport radio station at 10 a.m. During the years at issue, Rev. Pemberton went to the radio station each day to make the broadcast. Rev. Pemberton was also vice president of the Ministers Alliance, an association of ministers in the Harrison County area. He was also chairman of a committee that coordinated the 1969 Gulfport visit of the Billy Graham Crusade, an activity that consumed much of his time that year. In addition to his other activities, Rev. Pemberton preached at other churches upon invitation, although, because of his many other duties and activities, he had to decline most of those invitations. Rev. Pemberton was first appointed chaplain of the Harrison County jail in 1956, initially an unpaid position. He began the chaplaincy as a special mission or ministry of his church. His work with prisoners was motivated by his desire to minister to individuals, to help them restore and rehabilitate their lives. His ministry to the prisoners included involving other churches and ministers in the activities at the county jail. In 1964, then Sheriff Eddie McDonald began paying Rev. Pemberton *505 a salary of $200 per month for his services as chaplain. When petitioner was elected, he increased Rev. Pemberton's salary to $500 per month, more than he paid some of his full-time deputies. During petitioner's administration, Rev. Pemberton was at the jail every morning, and he was in and out during the remainder of most days to preach to and counsel prisoners and to help them contact friends and relatives outside. Rev. Pemberton arranged regular Sunday services for the prisoners, providing a rotation of ministers of various denominations (including himself). Rev. Pemberton also accompanied many prisoners from the county jail to the state prison or state mental hospital. Some of these trips were at the request of the prisoners' friends and families, while others were on Rev. Pemberton's own initiative. On these trips, he occasionally also served as deputy sheriff or guard. Finally, Rev. Pemberton spent much time showing an educational film at various schools, churches, and civic organizations. The film warned of the dangers of drug and alcohol abuse. Petitioner bore the costs of the film, equipment, and transportation for Rev. Pemberton's dissemination of the film. Respondent *506 allowed a deduction for one-half ($3,000 per year) of the annual salary that petitioner paid to Rev. Pemberton but disallowed the other one-half as unreasonable compensation. Hunter Patton
During the years in issue, petitioner employed his son, Hunter Patton (Hunter), as a deputy sheriff. Until June of 1970, Hunter was a full-time student. He was in high school until he graduated in May of 1968. He started college at Jeff Davis Junior College in September 1968 and continued for two college school years, ending in June 1970. Hunter did not attend school during the summers. Hunter generally worked the day shift and weekends. Petitioner paid Hunter salaries of $3,600, $3,700, and $3,174 for the years 1968 through 1970, respectively. Respondent disallowed one-half of these salary payments as excessive and unreasonable compensation. Others
In 1970 petitioner's daughter-in-law, Delores Patton, worked on a highway program paid for by the state or Federal government, and not by the Harrison County government. Petitioner paid her a salary of $1,600 that year, but did not know what, if any, services she rendered to the sheriff's department. Petitioner also paid Juanita *507 Flynt, apparently his niece, a salary of $287 in 1969, but could not recall what services she may have rendered. Respondent disallowed both claimed salary deductions. The record does not establish that these women performed any services for petitioner as sheriff or as tax collector. Among the other salaries paid by petitioner to full-time employees, and allowed by respondent, were the following: AMOUNT
Name
Position
1968
1969
1970
J. C. McGuire
Chief office deputy
$9,600
$9,600
$9,600
J. C. Ladner
Deputy sheriff
2,950
3,275
3,500
C. H. Ladner
Dispatcher/deputy sheriff
3,605
4,100
Leon Ladner
Deputy sheriff
3,000
3,275
3,800
Leasing Loss
During 1968, petitioner and E. E. Ladner (Ladner) were partners in a venture involving the leasing of equipment for grading and hauling dirt and other materials at construction sites. Petitioner and Ladner purchased two trucks for use in their venture for the respective amounts of $17,731.07 and $17,282.99. They made down payments of $3,094.68 and $3,016.34 for the two trucks, financing the balance of the purchase prices. Petitioner and Ladner also entered into a six-month lease *508 with a purchase option for a Caterpillar bulldozer, calling for monthly rental payments of $1,500. Petitioner and Ladner supplied the equipment and bore various costs of operation; their lessee used their equipment on a construction project, making rental payments to petitioner and Ladner. The payments petitioner and Ladner received from the lessee were barely sufficient to cover their expenses; consequently, petitioner and Ladner turned in the bulldozer at the end of the six-month lease in December of 1968 and terminated their venture. For the year 1968, the joint venture had gross receipts of $17,013.97, and expenses of at least $16,311.23. Petitioner and Ladner found a buyer who assumed their purchase obligation on the two trucks, but that purchaser paid them no cash. Apart from the down payments on the two trucks, the record does not show whether petitioner had a small profit or a small loss on the year's business operations. On their 1968 returns, petitioner and Ladner each claimed a net loss in the amount of $7,767.11 from their leasing venture. Of this loss, $4,666.35 represents the loss each partner claimed from the disposition of the two trucks. Although a few of the *509 items on petitioner's return with respect to the leasing venture were substantiated and stipulated to by the parties at trial, most of the items were not substantiated. Neither petitioner nor Ladner was able to produce the records of the leasing venture, each suggesting the other person had such records. Ladner's loss on the leasing venture was computed by H & R Block, his tax return preparer, and petitioner simply used the same figure in claiming his share of the loss on his amended return for 1968. Respondent has disallowed this claimed loss for lack of substantiation. Insurance Premium
As sheriff of Harrison County, petitioner was responsible for the acquisition and operation of a number of vehicles. Petitioner obtained insurance coverage (collision, comprehensive, physical damage and liability) for the vehicles from the Baronich General Insurance Agency. In 1969, petitioner claimed a deduction for an insurance premium in the amount of $3,465, which respondent disallowed for lack of substantiation. On audit, respondent's revenue agent discovered a check stub dated January 31, 1969 to the Baronich Agency in the amount of $3,465. The revenue agent examined petitioner's *510 bank statements for 1969 but could not find that a check in the amount of $3,465 had cleared petitioner's account. Petitioner was unable to produce a cancelled check on audit or at trial. Normally, the Baronich Agency would have cancelled an insurance policy if the premium remained unpaid for more than 60 days. Petitioner's policy was not cancelled. Petitioner sued the insurer, among other, on the policy to collect $10,000 for damage to his vehicles resulting from Hurricane Camille in 1969. The pleadings in that lawsuit also list petitioner's 1969 insurance premium as $3,465. During the suit, the insurer at one time raised a defense of nonpayment of the premium. Ultimately, the suit was settled by the insurer's payment to petitioner of $7,500. Grand Jury Investigation
Sometime after the FBI's 1971 seizure of the bingo pinball machines used for gambling in Harrison County, a special grand jury for the Southern District of Mississippi was empanelled to investigate criminal activities in Southern Mississippi. This grand jury appears to have grown out of an investigation by a special Justice Department organized crime strike force operating out of New Orleans. Many *511 of the operators of pinball gambling machines were subpoenaed to testify before that grand jury. Before this grand jury, Ware denied that he had ever collected payoff monies from the operators on behalf of petitioner. This grand jury, or another grand jury, was also investigating petitioner on a tax matter. Eventually, petitioner was indicted for willfully filing false tax returns under section 7206(1). Later Ware was indicted and convicted of perjury for his testimony to the grand jury. His conviction was subsequently overturned because he had not been given a proper Miranda warning. While Ware was awaiting possible retrial, petitioner's tax prosecution was pending. Because he felt a conviction would ruin him politically, petitioner tried to persuade Ware to adhere to his testimony before the grand jury, i.e. that he (Ware) had not collected payoffs from the gambling operators on behalf of petitioner. Instead, after a promise that he would receive a grant of immunity, Ware recanted his grand jury testimony. [3] Ultimately, petitioner entered a plea of nolocontendere to some or all of the tax charges against him. *512 Before this case was tried, respondent, through the United States Attorney, obtained an order under Rule 6(e), Federal Rules of Criminal Procedure, releasing to him transcripts of the grand jury testimony of the Alstons, Burt, Ware, Ingrassia, Maxie Broadus, L. S. Broadus, and Gill for use in this Court. The United States Attorney's request to the District Court for the Southern District of Mississippi for disclosure of these witnesses' grand jury testimony stated the following purposes: "to facilitate the recollection of the witnesses; to use as past recollection recorded in the event of total loss of recollection of memory by a witness; anf for impeachment purposes if a witness were to testify differently now than at the time he was before the Federal Grand Jury." Any use of these materials at the trial came within the purposes for which the Rule 6(e) order was granted by the District Court. ULTIMATE FINDINGS OF FACT 1. Petitioner understated his taxable income and underpaid his taxes in each of the years 1968 through 1970. 2. Part of petitioner's underpayment of tax for each year was due to fraud with intent to evade taxes. 3. Petitioner incurred an ordinary loss of *513 $2,700 in connection with the equipment leasing venture in 1968. 4. Petitioner paid an insurance premium in the amount of $3,465 in 1969. OPINION In this fraud case, most of the crucial evidence was presented by testimony rather than by documents and stipulated facts. The testimony of many of the witnesses was in sharp conflict with that of petitioner, and our findings of fact necessarily required resolution of credibility issues, the "daily grist of judicial life." Diaz v. Commissioner,58 T.C. 560, 564 (1972). In some instances, our findings are based upon the previous testimony and statements of various individuals, which respondent properly presented either to refresh the fading memories of the witnesses or as recorded recollections. See Fed. R. Evid. 612, 613, 803(5). In any event, whatever minor discrepancies exist in the testimony of the participants in the payoffs and kickbacks (the Alstons, Ware, Gill, and Burt) are largely attributable to the lapse of time since the events of 1968 through 1970 occurred, and these individuals agreed that their memories were fresher and clearer on the earlier occasions. Petitioner's objection to respondent's use *514 of Burt's grand jury testimony is unfounded. See footnote 2. Respondent had possession of that testimony pursuant to a District Court order under Rule 6(e), Federal Rules of Criminal Procedure, specifically for the purposes he used such prior testimony--memory refreshment, recordation of a past recollection and impeachment. To the extent the prior testimony may have been used to impeach respondent's own witness, and we think it was not so used, such use too would have been proper. See Fed. R. Evid. 607. We have held that the recent Supreme Court decisions [4] regarding disclosure of grand jury materials do not apply retroactively in collateral proceedings, such as this tax case, to deny respondent use of grand jury materials obtained under Rule 6(e) orders issued prior to those Supreme Court decisions. Kluger v. Commissioner,83 T.C. 309 (1984). Even if those recent Supreme Court decisions applied retroactively, respondent's possession and use of the grand jury materials in this case were clearly proper under those Supreme Court decisions and under the present standards *515 governing disclosure. See United States v. Baggot,463 U.S. 476 (1983); United States v. Sells Engineering, Inc.,463 U.S. 418 (1983); Douglas Oil Co. v. Petrol Stops Northwest,441 U.S. 211 (1979); United States v. Proctor & Gamble Co.,356 U.S. 677 (1958). I. Fraud
The statute of limitations precludes respondent's assessment and collection of any deficiencies unless respondent proves that petitioner's returns were false or fraudulent with the intent to evade tax so that the tax may be assessed "at any time." Secs. 6501(a), (c)(1). The requisite fraud under section 6501(c)(1) is essentially the same as that necessary to sustain the section 6653(b) fraud addition. Tomlinson v. Lefkowitz,334 F. 2d 262 (5th Cir. 1964), cert. denied 379 U.S. 962 (1965); Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976). *516 [5] Respondent has the burden of establishing petitioner's fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Stone v. Commissioner,56 T.C. 213, 220 (1971). Respondent must establish (1) that petitioner underpaid his taxes during each year, and (2) that some part of petitioner's underpayment each year was due to fraud. Hebrank v. Commissioner,81 T.C. 640, 642 (1983); Plunkett v. Commissioner,465 F. 2d 299, 303 (7th Cir. 1972). See Jenkins v. United States,313 F. 2d 624, 627 (5th Cir. 1963). [6] We conclude that respondent has carried his burden.
A. Underpayment
Respondent has established by clear and convincing evidence an underpayment of tax for each year in issue. We are wholly persuaded by the testimony of the various bingo machine operators and one of the bail bondsmen. We do not believe petitioner's self-serving, wholly uncorroborated denial of receipt of kickbacks *517 from these gambling operators, or his "explanation" of his receipt of payments from Earl Owen and Gill, the bail bondsmen he appointed. Petitioner's public stance against gambling during his term as sheriff is uncontroverted, as is the fact of his seizure of gambling machines early in 1968, a few weeks after his election to office. We are satisfied that the seizure was simply to determine the locations and numbers of such machines for purposes of setting the payoffs to be made by the various operators. Under petitioner's version of the events, this seizure was done for another purpose, namely to generate support for his efforts against gambling in Harrison County. Even if petitioner's seizure of the machines was illegal, as he testified, his seizure allowed him to identify the machines and operators for future investigation and enforcement. The use of these machines in Harrison County for gambling purposes was widespread and well known during petitioner's term of office. Nonetheless, there remains the stark and uncontroverted fact that petitioner never again seized a single gambling machine during his term as sheriff. The illegal gambling ended only in 1971 when the FBI *518 seized the machines. That the operators ran their gambling machines with impunity during petitioner's term of office wholly undermines petitioner's pious posturing against gambling. In addition to petitioner's uncontroverted noninterference with operation of the gambling machines after early 1968, there was the clear testimony of the "bag" man, Ware, and several of the gambling operators that the operators made monthly payoffs to petitioner either directly or through Ware to ensure petitioner's noninterference with their gambling operations. These witnesses also described what we have found to be the true purpose of petitioner's 1968 seizure of the gambling devices--identification of the machines and the operators to facilitate the payoffs. We accept Ware's testimony about his role as petitioner's pickup man. See footnote 3. Although a perjury conviction would ordinarily diminish severely the credibility of a witness's testimony, here Ware's perjury conviction was for his denial before the grand jury of his role as bag man. The testimony and evidence that led to Ware's perjury conviction *519 were consistent with Ware's later recantation of his grand jury testimony and his testimony in this Court regarding his collection of petitioner's payoff money. Petitioner admitted receiving a total of $300 a month from Earl Owen and Gill, his appointed bail bondsmen, and he did not report the money as income on his tax returns for these years. His explanation was that he was acting as a conduit for payments to Earl Owen's brother to allow Ed Owen to continue on the public employment roll without a break in service, in order to protect his civil service retirement. This explanation is not borne out by the record. The record does not show that these payments were ever included in the gross receipts of the sheriff's office, although deductions were claimed for salary payments to Ed Owen. Ed Owen died in May of 1970. Earl Owen and Gill continued to make the monthly payments to petitioner after Ed Owen's death and until they received bail bondsmen's licenses from the state. The record does not support petitioner's claim that the payments after Ed Owen's death were contributions to petitioner's political campaign. We conclude that petitioner obtained these monthly payments *520 from Gill and Earl Owen as kickbacks for appointing them as bail bondsmen. Earl Owen and Gill continued to pay petitioner kickbacks for as long as petitioner could remove them; they ended the kickbacks only when they were finally licensed by the state. Lastly, petitioner's payment of $1,000 a month to Maxie Broadus in 1968 and 1969 was plainly not an allowable salary deduction in those years. Maxie Broadus was employed full time by the City of Gulfport as its chief of detectives during all of 1968 and about half of 1969. Maxie was present at the Harrison County jail often because that was where the City of Gulfport, having no jail of its own, jailed its prisoners. Other than Maxie's passing on law enforcement information to petitioner, data he obtained as Gulfport's chief of detectives, Maxie rendered only minimal, if any, services forpetitioner (as opposed to services relating to Maxie's duties as Gulfport's chief of detectives). This $12,000 "salary" for Maxie's minimal services was 25 percent higher than the $9,600 petitioner paid J. C. McGuire, his full-time chief office deputy. We are satisfied that Maxie Broadus received the 1968 and 1969 payments in exchange for *521 his 1967 campaign support of petitioner, payments petitioner had promised him regardless of any work Maxie might perform. [7] Even after Maxie left his job with the City of Gulfpoort in July of 1969, he did not commence regular full-time employment for petitioner until 1970. Maxie spent most of the intervening time, the next five or six months, clearing his farm and petitioner's farm of debris from Hurricane Camille. Put most charitably to petitioner (in recognition of respondent's burden of proof), his claimed deductions in 1968 and 1969 for Maxie's "salary" were grossly excessive, if not outright fraudulent. Petitioner did not report the payoffs and kickbacks he recedived during the years in issue, although such amounts were income to him. Sec. 61; Cain v. Commissioner,460 F. 2d 1243 (5th Cir. 1972), affg. a Memorandum Opinion of this Court. *522 See Caldwell v. Commissioner,135 F. 2d 488 (5th Cir. 1943). Petitioner also claimed a totally unwarranted salary deduction for Maxie Broadus in 1968 and 1969. Respondent has established these items by clear and convincing evidence; consequently, respondent has proven that petitioner underpaid his taxes in 1968, 1969, and 1970. B. Fraud
The fraud addition to tax is designed as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from a taxpayer's fraud. Helvering v. Mitchell,303 U.S. 391, 401 (1938); Brooks v. Commissioner,82 T.C. 413, 430-431 (1984). The fraud envisioned by section 6653(b) and by section 6501(c)(1) is "actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981). *523 Respondent must show that petitioner intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent collection of such taxes. Webb v. Commissioner,394 F. 2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). Fraud is a factual question to be determined on the basis of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1965). Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, petitioner's entire course of conduct must be considered and his fraudulent intent can be established by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,supra,67 T.C. at 200; Stone v. Commissioner,supra,56 T.C. at 223-224; Otsuki v. Commissioner,supra,53 T.C. at 105-106. *524 Petitioner's consistent understatement of his income with consequent underpayment of his taxes for the years in question is strong evidence of his intent to evade taxes. Merritt v. Commissioner,301 F. 2d 484, 487 (5th Cir. 1962); Cefalu v. Commissioner,276 F. 2d 122, 129 (5th Cir. 1960); Brooks v. Commissioner,supra,82 T.C. at 431; Vannaman v. Commissioner,54 T.C. 1011, 1018 (1970). [8] That petitioner's unreported income was from illegal activities is additional evidence of his tax evasion motive. McGee v. Commissioner,519 F. 2d 1121, 1126 (5th Cir. 1975), affg. 61 T.C. 249 (1973); Berlin v. Commissioner,42 T.C. 355, 357 (1964); Estate of Brame v. Commissioner,25 T.C. 824, 831 (1956), affd. per curiam 256 F. 2d 343 (5th Cir. 1958). [9] Moreover, petitioner's failure to keep books and records regarding this income also indicates fraud. Otsuki v. Commissioner,supra,53 T.C. at 109-110; Safra v. Commissioner,30 T.C. 1026, 1036 (1958); *525 Arlette Coat Co. v. Commissioner,14 T.C. 751, 756 (1950). Furthermore, the "salary" petitioner paid Maxie Broadus was, at best, grossly excessive, and for the first two years was, in fact, a political payoff rather than payment for the performance of any services to the sheriff's office. This too is an indicium of petitioner's fraudulent intent. Neaderland v. Commissioner,52 T.C. 532, 539-540 (1969), affd. on a related issue 424 F. 2d 639 (2d Cir. 1970), cert. denied 400 U.S. 827 (1970); Norie v. Commissioner,3 T.C. 676, 683-685 (1944), affd. sub nom. Coast Carton Co. v. Commissioner,149 F. 2d 739, 742 (9th Cir. 1945). [10] Finally, petitioner's unsuccessful attempt to induce Ware to adhere to his perjured testimony before the grand jury evidence petitioner's continuing efforts long after the tax years in issue to cover up his extorted income and tax evasion.
*526 Based upon all of the evidence of this case, we conclude that respondent has proved by clear and convincing evidence that petitioner's underpayment of tax in each of the years 1968, 1969, and 1970 was fraudulent with the intent to evade taxes. Accordingly, respondent's assessment and collection of petitioner's taxes are not barred by the statute of limitations, sec. 6501(c)(1), and respondent's determination of the fraud addition is sustained for each year. II. Deficiencies
In his statutory notice of deficiency, respondent determined (1) that petitioner had unreported income, (2) that certain deductions claimed for salaries were not allowable, (3) that petitioner had not substantiated his claimed 1968 loss from a leasing venture, and (4) that petitioner had not substantiated payment in 1969 of an automobile insurance premium. Petitioner has the burden of proof on these issues. Rule 142(a); Zack v. Commissioner,692 F. 2d 28 (6th Cir. 1982), affg. a Memorandum Opinion of this Court, cert. denied 460 U.S. 1084 (1983). A. Unreported Income
Respondent determined that petitioner received unreported income in the amounts of $28,100, $22,800, *527 and $17,000 for the years 1968, 1969, and 1970, respectively. Respondent has overwhelmingly proven petitioner's receipt of payoffs and kickbacks during these years. The evidence of record--particularly Ware's testimony regarding the sums he collected on behalf of petitioner from the various gambling operators and his descriptions of their operations, the testimony of the Alstons and Burt regarding their payments and operations, petitioner's admission that he received money from the bail bondsmen, and Gill's testimony--strongly indicates petitioner's receipt of at least the amounts determined by respondent. Compare United States v. Janis,428 U.S. 433, 441-443 (1976); Jackson v. Commissioner,73 T.C. 394, 401 (1979). Throughout this case petitioner has denied receiving the kickbacks and payoffs and has "explained" the payments from Earl Owen and Gill. We based our findings on the testimony of the many witnesses presented by respondent, and did not believe petitioner's denials or his explanation. Moreover, there is no basis in the record for petitioner's suggestion that any of the kickbacks from Earl Owen and Gill were included in the unidentified *528 "miscellaneous" income he reported in 1969 and 1970. Petitioner's argument that he was merely a conduit for payments from Earl Owen and Gill to Ed Owen is not borne out by the facts of record; indeed, we found to the contrary in discussing the fraud issue above. Petitioner has shown no error in respondent's determinations of unreported income. B. Disallowed Salaries
Respondent disallowed various deductions petitioner claimed for "salaries" paid to various indiciduals. Section 162(a)(1) allows a deduction for amounts paid or incurred as compensation for the performance of services. To be deductible, such compensation must actually be intended as payment for services actually rendered, and it must be a reasonable quid pro quo for such services. Sec. 1.162-7, Income Tax Regs; Nor-Cal Adjusters v. Commissioner,503 F. 2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Paula Construction Co. v. Commissioner,58 T.C. 1055, 1058-1059 (1972), affd. without opinion 474 F. 2d 1345 (5th Cir. 1973); Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1340 (1971), affd. *529 without opinion 496 F. 2d 876 (5th Cir. 1974). Petitioner claimed deductions for salary payments to various individuals who supported him in his political campaign for the position of sheriff.As discussed above in relation to the fraud issue, petitioner paid Maxie Broadus $1,000 per month during 1968 and 1969 for Maxie's 1967 campaign support. Petitioner has not proven that Maxie performed any services for him in 1968 and 1969 that were beyond the scope of Maxie's duties as the chief of detectives for the City of Gulfport, services for which the city compensated Maxie. [11] Consequently, respondent's disallowance is sustained. L. S. Broadus was petitioner's employer before petitioner became sheriff and was an active supporter during petitioner's political campaign. During the years in issue, L. S. Broadus was over 70 years of age. Despite petitioner's colorful tale about L. S. Broadus' patrolling northern *530 Harrison County to prevent cattle restling, we are unconvinced that L. S. Broadus did anything more than drive through the area on his way to and from his farm in Stone County, just north of the Harrison County line. Petitioner has shown no error in respondent's disallowance. R. Hart Chinn was a long time Harrison County politician, who during the years 1968 through 1970 was also quite elderly. Chinn's primary task seems to have been to keep an eye on his former political enemies at the board of supervisors and elsewhere. Nonetheless, Mississippi law did require the presence of the sheriff or a deputy to open the board's meetings. Although respondent may be correct in his argument that petitioner could have sent one of his other deputies, rather than hiring Chinn, the fact remains that Chinn was deputized and did attend the board's meetings in petitioner's stead. The board met regularly twice a month, and had an undetermined number of special meetings. Chinn's services in opening these meetings meet the "ordinary and necessary" test of section 162, but there is no evidence of any other qualifying services performed by Chinn. In light of the amounts petitioner paid his *531 other employees, the $150 per month he paid Chinn was quite excessive in relation to the minimal and infrequent qualifying services Chinn rendered. Consequently, exercising our best judgment, we hold that $50 per month of Chinn's salary is deductible as reasonable compensation. Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930). Ed Owen was another of petitioner's political cronies placed on the sheriff's payroll, apparently to prevent a break in his service time for computing a future pension. Ed Owen owned a night club in northern Harrison County, at which he spent the bulk of his work time. The $300 a month petitioner paid Ed Owen is clearly excessive for the minimal services he performed. Indeed, the quantum of his services may well have been even less than that of the unpaid, volunteer deputy sheriffs who abounded during petitioner's term of office. However, Ed Owen did occasionally patrol with other officer and respondent concedes that he was on emergency call. On the basis of this record, we conclude that $30 per month is reasonable compensation for any services actually rendered. Cohan v. Commissioner,supra.
Rev. G. *532 L. Pemberton began serving as chaplain of the Harrison County jail more than 10 years before petitioner became sheriff. Petitioner's predecessor began paying Rev. Pemberton a salary. When petitioner came into office, he increased the chaplain's salary from $200 a month to $500 a month. Respondent determined that only half ($250 per month) of the salary petitioner paid Rev. Pemberton was reasonable and the other half was excessive. On this record, we agree with respondent. It is undisputed that Rev. Pemberton was an extremely valuable member of petitioner's staff. Rev. Pemberton counselled and preached to inmates at the jail, helped the prisoners contact friends and families, rode with prisoners to the state mental hospital and the state prison to calm and counsel them, and disseminated the popular drug abuse prevention film that petitioner had purchased. Nonetheless, the fact remains that Rev. Pemberton had his own church and congregation and a daily radio program. These duties took up much of his time, as did his other community and ministerial activities, such as the Minister's Alliance and a Billy Graham Crusade. The deduction allowed by respondent, $3,000 per year, is about *533 the same or only slightly less than what petitioner paid some of his full-time deputies. Rev. Pemberton was clearly not a full-time chaplain. We do not think that petitioner has adequately proven his entitlement to a deduction for Rev. Pemberton's salary in any amount greater than respondent has allowed. Hunter Patton, petitioner's son, was a deputy sheriff for petitioner during the years in issue. He was also a full-time student during virtually all of this this period. Hunter's salaries of $3,600, $3,700, and $3,174 in 1968, 1969, and 1970, respectively, were comparable to what petitioner paid full-time deputies. Respondent disallowed half of these amounts as excessive. Since Hunter was a full-time student, we do not think that he worked as much as did petitioner's full-time deputies, but it is more likely than not that he worked in total hours somewhat more than half time. Under Cohan v. Commissioner,supra, we conclude that the amounts of $2,000, $2,100, and $1,800 were reasonable compensation for Hunter's services during 1968, 1969, and 1970, respectively. Finally, there is no evidence regarding what, if any, services Delores Patton and Juanita Flynt *534 performed for petitioner. Consequently, we sustain respondent's disallowance of deductions for their "salaries." Rules 142(a), 149(b). C. Leasing Venture
Respondent denied petitioner's claimed 1968 equipment leasing loss for lack of substantiation, and most of the items claimed with respect thereto remain unsubstantiated. Nonetheless, it is clear that petitioner and his partner were engaged in a leasing venture, that they made cash down payments totalling $6,101.02 for the purchase of two trucks, that they returned their bulldozer at the end of its six-month lease period, and that they disposed of their trucks by finding a purchaser who, without paying any cash, assumed the remaining purchase obligations on the trucks. Because all of the events regarding this venture occurred within a single taxable year, many of the complex problems of abjustments to basis for depreciation and so forth need not be addressed here. Petitioner and his partner commenced and terminated their leasing venture within a single year. They abandoned their venture before the end of 1968 because their receipts from the equipment barely covered their expenses. They recovered no cash when they disposed *535 of their trucks, thus in effect losing their down payment. In this instance, petitioner's story about the leasing venture was completely corroborated by his partner, whom we found to be forthright and credible. Unfortunately, neither partner could furnish the financial records to document the details of the transaction. Apart from the down payments on the trucks, the only information in the record shows gross receipts of $17,013.97 and expenses of at least $16,311.23 (not including any depreciation). Thus, there may have been a positive cash flow of a few hundred dollars, or it may be that actual expenses exceeded or equalled receipts. We are persuaded that petitioner did incur a deductible loss from his ill-fated 1968 leasing venture. On the limited record before us, we could not find a loss in excess of $3,055.51, petitioner's half-share of the lost down payments on the trucks. However, because of uncertainties as to the actual cash flow from the transaction, we are not wholly persuaded that petitioner should be allowed the full amount of the loss on the trucks. Accordingly, exercising our best judgment, and resolving doubts against petitioner whose inexactitude is of his own *536 making, we conclude that he is entitled to an ordinary loss of $2,700 in 1968. Cohan v. Commissioner,supra.
D. Insurance Premium
Respondent disallowed for lack of substantiation petitioner's claimed deduction in 1969 for an automobile insurance premium on the sheriff's fleet of vehicles. Although we are throubled by petitioner's inability to produce the cancelled check and by the futile search by respondent's revenue agent for any record of such check clearing petitioner's bank account, we are nonetheless persuaded that petitioner in fact paid the required premium of $3,465. Strict documentary substantiation is not required in this instance. Compare sec. 274. The stark fact is that the insurance company would normally cancel the policy if the premium remained unpaid over 60 days, and the policy was never cancelled. Moreover, petitioner's insurer settled petitioner's $10,000 lawsuit under that policy by paying him $7,500. Insurance companies normally do not pay 75 percent in settlement of a claim where the insured has not paid the premium on his policy. Based on these facts, we conclude that petitioner paid the insurance premium, and we hold petitioner *537 is entitled to the claimed deduction. To reflect the concessions and the foregoing holdings, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, unless otherwise noted. Unless otherwise indicated, any references to "Rules" are to the Tax Court Rules of Practice and Procedure.↩
2. Although Bart testified before this Court that he made the payments to Maxie Broadus or Ware rather than to petitioner, he had testified on four earlier occasions (twice before a grand jury, at Ware's perjury trial, and before respondent's agents) that he made the payments directly to petitioner. The Court accepted the earlier testimony because Burt agreed his recollection of the events was clearer on the earlier occasions and testified that his testimony in 1972, 1973, 1974, and 1975 was truthful and accurate.↩
3. No actual grant of immunity was ever obtained for Ware, although he renewed his request for one in connection with this trial before the Tax Court. Respondent declined to seek a grant of immunity because the statute of limitations had long since run on any matters arising out of that grand jury proceeding. Despite Ware's claim of the Fifth Amendment↩, this Court ordered Ware to testify because the statute of limitations had run on any matters arising out of his testimony before the grand jury in 1972 or 1973. However, the Court admonished Ware that he could be charged if he perjured himself before the Tax Court in the pending case. The Court is satisfied that Ware testified truthfully in this proceeding and has accepted his testimony and his signed statement despite the fact that he is a convicted perjurer.
4. United States v. Baggot,463 U.S. 476 (1983); United States v. Sells Engineering, Inc.,463 U.S. 418↩ (1983).
5. See also Phillips v. Commissioer,T.C. Memo. 1984-133; Rinehart v. Commissioner,T.C. Memo. 1983-184↩. 6. See also Phillips v. Commissioner,supra.↩
7. Maxie Broadus gave a written statement to that effect back in 1974. At the trial before this Court, he tried to help petitioner, his long-time friend, by suggesting that he did render some services in 1968 and 1969. However, his efforts were rather feeble, and he never repudiated his earlier written statement.↩
8. See also Phillips v. Commissioner,supra;Zack v. Commissioner,T.C. Memo. 1981-700, affd. 692 F. 2d 28 (6th Cir. 1982), cert. denied 460 U.S. 1084↩ (1983). 9. See also Cain v. Commissioner,T.C. Memo. 1971-45, affd. per curiam 460 F. 2d 1243 (5th Cir. 1972); Shades Ridge Holding Co., Inc. v. Commissioner, T.C. Memo. 1964-275, affd. per curiam sub nom. Fiorella v. Commissioner,361 F. 2d 326↩ (5th Cir. 1966). 10. See also Cosmopolitan Credit Corp. v. Commissioner,T.C. Memo. 1972-103, affd. per curiam without published opinion 474 F.2d 1344↩ (5th Cir. 1973).
11. Respondent allowed petitioner's 1970 deduction for Maxie's salary because Maxie Broadus actually worked for petitioner full time that year. No issue of reasonableness of the amount of his salary that year has been raised, so we do not address that matter.↩